ORVAL C. SUTTER, Public Administrator of St. Louis County, Missouri, in charge of the Estate of L. H. Dodd, Deceased, and AMERICAN INSTITUTE OF STEEL CONSTRUCTION, a Corporation, v. GERTRUDE EASTERLY, W. SCOTT PETERS, EXCHANGE NATIONAL BANK OF JEFFERSON CITY, MISSOURI, a Corporation; as Executor of the Last Will and Estate of David W. Peters, Deceased, and HARVEY B. Cox, Appellants.—No. 39477.—189 S. W. (2d) 284.

Division One, September 4, 1945.

*Harvey B. Cox, W. Scott Peters* and *Roberts P. Elam* for appellants.

*Moser, Marsalek & Dearing* for respondents.

288

DOUGLAS, J.—This is a suit in equity to set aside a judgment at law on the ground it was obtained through fraud.

Gertrude Easterly and her husband were driving east on Highway 50 between Jefferson City and St. Louis when they had a head-on collision with the automobile driven by L. H. Dodd, an employee of the American Institute of Steel Construction, who was driving in the opposite direction. She brought suit for damages for personal injuries, her chief counsel being David W. Peters of Jefferson City, now deceased. The sole and decisive question in the case was which party was driving on the wrong side of the road thereby causing the collision. The only witness who testified besides Mrs Easterly, her husband and Dodd was one William C. Schilling. He stated that Dodd cut a curve and drove on the wrong side of the road and the collision resulted. .The jury returned a verdict for Mrs. Easterly for $35,000, later reduced by remittitur to $25,000. The reduced judgment was affirmed by this court. Easterly v. American Institute of Steel Construction et al., 349 Mo. 604, 162 S. W. (2d) 825. Shortly thereafter the present equity suit was filed. . Dodd died and the public administrator was substituted for him as plaintiff.

The petition charges the judgment was obtained by fraud on the court. After setting out the substance of Schilling's testimony the petition alleges that it was perjured; that Schilling did not see the accident; that when the accident occurred Schilling was at Stoutland, Mo., many miles away tending cattle; and that Schilling's testimony was a complete fabrication; "that Schilling informed said David W. Peters that he, the said Schilling, did not witness the accident; that said David W. Peters then related to said William C. Schilling the manner in which said Easterlys alleged the accident had occurred and exhibited to him some photographs of the scene, and later drove said Schilling to the scene of the accident and further explained the Easterlys' version of the occurrence, all for the purpose of schooling and instructing said Schilling so as to enable him to give the aforesaid false testimony."

"That said David W. Peters, in his capacity as agent and attorney for Gertrude Easterly and while acting in her behalf, was informed and knew said William C. Schilling had not witnessed said accident, and knew nothing of his own knowledge with respect to the cause of

said, collision; that notwithstanding said fact, the said attorney schooled and instructed said Schilling as aforesaid, and conspired and confederated with said Schilling to have said Schilling appear at the trial of said case as a witness, for the purpose of giving the false testimony above set forth;''

At the trial of this case Schilling was called as a witness. After answering the usual formal questions he refused to answer further questions on the ground he might incriminate himself. An affidavit made by Schilling was introduced. It is as follows:

"Jefferson City, Mo.
"July 6, 1942.

"My name is William C. Schilling and reside at Greenberry Road, Route 4, Jefferson City, Missouri. I am known among many of my associates and friends as Fred Schilling. I am sixty years of age and reside with my wife, Mildred W. Schilling. I am at present employed by the Unemployment Compensation Commission at Jefferson City, Missouri.

"On July 1st, 1942, in Room 423 of the Missouri Hotel, Jefferson City, Missouri, I admitted to Albert Thomas Sauer, an attorney, that I was not present at the time of an automobile accident which occurred west of Drake, Missouri, on Highway 50, on November 18, 1937, in which a Mr. and Mrs. Easterly of Alva, Oklahoma, were injured. As a matter of fact on the above date, I was in Stoutland, Missouri, tending cattle which had been owned by Mr. Emmett Kinsella who died on November 13, 1937. At the time of my conversation with Mr. Sauer on July 1st, 1942, I informed him of the fact that Mabel Hornbuckle had prevailed upon me to testify on behalf of Mr. and Mrs. Easterly as having witnessed the accident referred to above.

"The true facts as to my connection with this accident and suit which later followed are as follows: Shortly after the accident of November 18, 1937, I met Miss Mabel Hornbuckle in Jefferson City. I had known her for some twenty-three years, due to her friendship with my former employer, Mr. Emmett Kinsella. She informed me that an accident had occurred on Highway 50 near Drake, Missouri, and that Attorney David W. Peters and Scott Peters of Jefferson City, Missouri, represented the plaintiffs. She informed me that this was an opportunity for both she and I to make some money out of the case in testifying to the fact that we had witnessed the accident. She then gave me a brief resume of the facts, and I told her that I would go in on the matter with her. A day or two later I met Attorney Scott Peters in Tolson's Drug Store. He asked me if I had been with Mabel Hornbuckle when she was in that accident near Drake, Missouri. I informed him that I was and he suggested that I see his father, David W. Peters. I called at Mr. David W. Peters' office several days later and talked to him about the accident. During our

conversation I informed him of the fact that I did not witness the accident, but had been solicited by Mabel Hornbuckle to testify that I had witnessed the same. Mr. David W. Peters then related to me the facts of the accident and showed some photographs of the scene of the accident and later drove me to the scene of the accident which occurred a few miles west of Hopkins' Resort on Highway 50 near Second Creek which is about ten miles west of Drake, Missouri. When he drove me to the scene of the accident and explained how the same occurred, he then drove up to the Hopkins Lodge and went inside, while I waited in the car. I do not know who he talked to in the lodge, as I stayed in the car. He later told me that he was talking to the manager. However, I did not see him talk to him.

"When this suit of Mrs. Easterly's against the driver of the other car was tried in the Circuit Court of St. Louis, Missouri, in March, 1939, I attended the trial and testified to the fact that I witnessed the accident, and in response to an inquiry, stated that I did not stop because of the fact that Miss Mabel Hornbuckle, who was with me, had an appendicitis attack. This was not a true fact, as I did not witness the accident, nor was I near the scene of the accident on November 18, 1937. During the time that the case was tried, I made about four trips to St. Louis by train. While there I stayed at the American Hotel, and my hotel bill was paid by Mr. Scott Peters and the railroad fare was paid to me by the circuit clerk as witness fees and attendance of trial.

"During the course of this litigation, I talked over same with Mr. David W. Peters and Scott Peters on numerous occasions. On one occasion, I talked about the accident to Attorney Harvey Cox of St. Louis, who was associated with Mr. David W. and Scott Peters in the trial of this suit on behalf of the Easterlys. Whether or not Attorney Harvey Cox knew that I did not witness the accident is unknown to me. Our conversation was very limited, as he went over the facts of the accident very briefly with me. I have no definite information that Scott Peters knew that I did not witness the accident, as my conversation in regard to my not seeing the accident was with David W. Peters. However, Scott Peters was closely associated with his father in the practice of law, and particularly in this suit. Attorneys Cox, David W. and Scott Peters all attended the trial of this suit in the Circuit Court of St. Louis in 1939. All of them partook in some part of the trial of the case.

"I realize the fact that my testifying in the trial of this suit in the Circuit Court in St. Louis was not true. However, it is my desire at this time to tell the truth about my entire connection with this case, and for this reason I related the above facts. I am doing so without any coercion or duress on the part of Mr. Sauer. However, after having viewed considerable documentary evidence which he had had

from disinterested individuals to the effect that it would have been impossible for me to have been at the scene of the accident on November 18, 1937, I realize that the best course was to follow the advice of my friends and make a clean breast of the entire situation.

"I have read the above two pages statements and it is true.

"William C. Schilling.

"Subscribed and sworn to before me this 6th day of July, 1942. My commission expires March 6, 1942. [3]

"Guy N. Sone,

" (Seal)

"Notary Public."

Several witnesses testified as to Schilling's presence in Stoutland about the time of the collision.

The Chancellor in his decree found:

"The Court is of the opinion that the verdict and judgment in said case of Gertrude Easterly against L. H. Dodd and American Institute of Steel Construction was procured by extrinsic fraud.

"The evidence is clear that Mrs. Easterly's chief counsel, the Jefferson City attorney, ▆▆▆ entered into a scheme and conspiracy with one William C. Schilling to have Schilling appear at the Easterly trial as a pretended witness to the accident, and to give false testimony favorable to the plaintiff.

"In pursuance of that plan, Schilling did appear at the trial and testified for the plaintiff that while he, Schilling, was driving his automobile from St. Louis to Jefferson City, in company with one Hornbuckle, immediately behind the Dodd car, he saw Dodd drive his car on the wrong side of the highway, in front of the Easterly car, causing the collision and injury.

"The evidence is clear and convincing that Schilling's testimony was a deliberate and planned perjury; that he did not witness the accident, and at the time of the occurrence he, Schilling, was fifty miles away, tending cattle for one Kinsella, on the latter's farm near Stoutland, Missouri.

"It appears from the evidence that Schilling, for a number of years, had been a client of the Jefferson City attorneys; that they had represented him in a criminal matters, principally violations of the liquor laws, and that Schilling in one instance had been convicted.

"Before the trial the chief counsel took Schilling to the scene of the accident in his automobile, to familiarize him with the details of the situation. The rare schooling of Schilling is shown in the pretended testimony of Schilling at the trial, presenting a skillfully finished story, plausible, believable, and apparently real and disinterested, and the story undoubtedly carried influence and weight with the jury in the making up of their verdict.

"It appears from the evidence there was no genuine witnesses to the accident except the principals, Mr. and Mrs. Easterly on the plaintiffs' side, and Mr. Dodd on the defendants'.

"The circumstances relating to the location of the automobiles after the accident tended to corroborate Dodd's theory of the accident. The burden of proof was on the plaintiff, and it thus appeared that the balance of probability favored the defendants; and without the Schilling testimony the verdict would probably have been for Dodd and the American Institute. The disinterested 'witness' Schilling, therefore, became the controlling factor in turning the scales to the Easterly side.

"Not only was there fraud and perjury in the Easterly trial, but the evidence shows there was a concocted plan on the outside of court to prevent the defendants in that case from investigating and discovering the false witness. That the chief counsel for the plaintiff fraudulently concealed all information with respect to the false witness, and that was apparently a part of the scheme to prevent investigation and exposure of the fraudulent plan."

The Chancellor further found that plaintiffs had exercised due diligence and were not negligent in their efforts to learn the true facts and in investigating whether Schilling witnessed the collision.

The Chancellor ordered the judgment set aside and enjoined defendants from attempting to enforce it. Defendants appealed.

The rule is well settled that a court of equity will not interfere with a judgment at law unless there was fraud in the procurement of the judgment extrinsic or collateral to the matters tried upon which the judgment was rendered. Hockenberry v. Cooper County State Bank, 338 Mo. 31, 88 S. W. (2d) 1031 and cases cited therein. It is also well settled that giving false evidence is held not to be such fraud as will authorize equity to vacate a judgment. Although we believe the application of the latter rule has been extended beyond the bounds of reason and justice it is not necessary for the purpose of this case to discuss the point. See the protest of Lamm, P. J., in Howard v. Scott, 225 Mo. 685, 125 S. W. 1158 to the broad application of the rule.

In this case we have more than the perjured testimony of witness Schilling. We find the party's chief attorney engaged in a plot to furnish a false witness to "make the case" with perjured testimony and a conspiracy with such false witness to carry out the plot. There are cases which announce the rule that subornation of perjury by a party to a case is not such fraud as authorizes relief in equity but we have not found a case where that rule has been applied under facts as we have here.

Peters' scheme and conspiracy were such a violation of a lawyer's duty to the court,—a duty imposed not alone by principles of honesty and good morals but also by a code of ethics adopted as rules of

court, as to amount to a fraud on the court for which equity will grant relief.

In this conclusion we are supported by Hazel-Atlas Glass Co. v. Hartford-Empire ▮▮▮ Co., 322 U. S. 238, 88 L. Ed. 1250, 64 S. Ct. 997. That was an action to set aside for fraud a judgment obtained for a patent infringement. An attorney for Hartford prepared a spurious article and had it published in a trade journal over the name of the president of a glassworkers' union as the pretended author for the purpose of aiding an application for a patent on a glasspouring machine. The official was well paid for the use of his name. The patent was issued. The article was thereafter used in a case for infringement on appeal before the United States Circuit Court of Appeals and was relied on and quoted by the court in its opinion sustaining the patent. On the strength of the judgment $1,000,000 was paid and licensing agreements entered into. When it was later learned the article and its authorship were false, suit was brought to set aside the judgment for infringement. The Supreme Court of the United States ordering this done stated:

"Out of deference to the deep rooted policy in favor of the repose of judgments entered during past terms, courts of equity have been cautious in exercising their power over such judgments. United States v. Throckmorton, 98 U. S. 61, 25 L. Ed. 93. But where the occasion has demanded, where enforcement of the judgment is 'manifestly unconscionable,' Pickford v. Talbott, 225 U. S. 651, 657, 56 L. Ed. 1240, 1246, 34 S. Ct. 687, they have wielded the power without hesitation. Litigants who have sought to invoke this equity power customarily have done so by bills of review or bills in the nature of bills of review, or by original proceedings to enjoin enforcement of a judgment. And in cases where courts have exercised the power the relief granted has taken several forms: setting aside the judgment to permit a new trial, altering the terms of the judgment, or restraining the beneficiaries of the judgment from taking any benefit whatever from it. But whatever form the relief has taken in particular cases, the net result in every case has been the same: where the situation has required the court has, in some manner, devitalized the judgment even though the term at which it was entered had long since passed away.

"Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals. Cf. Marshall v. Holmes, 141 U. S. 589, 35 L. Ed. 870, 12 S. Ct. 62, supra. Proof of the scheme, and of its complete success up to date, is conclusive. Cf.

United States v. Throckmorton, 98 U. S. 61, 25 L. Ed. 93, supra. And no equities have intervened through transfer of the fraudulently procured patent or judgment to an innocent purchaser. Cf. Ibid.; Hopkins v. Hebard, 235 U. S. 287, 59 L. Ed. 232, 35 S. Ct. 26. . . .

"Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud. . . .

"We have, then, a case in which undisputed evidence filed with the Circuit Court of Appeals in a bill of review proceeding reveals such fraud on that Court as demands, under settled equitable principles, the interposition of equity to devitalize the 1932 judgment despite the expiration of the term at which that judgment was finally entered."

While the facts in the Hazel-Atlas case show more extensive fraud and one in which the client participated, the decision is authority for the principle that where a lawyer engages in a conspiracy to commit a fraud upon the court by the production of fabricated evidence and by such means obtains a judgment then the enforcement of the judgment becomes "manifestly unconscionable" and a court of equity may devitalize the judgment. Accordingly the action of the Chancellor in setting aside Gertrude Easterly's judgment was authorized upon proof of the fraud.

Proof of the fraud turns on the admissibility of Schilling's affidavit. We hold the affidavit is admissible as a declaration against interest by a third person not available as a witness. This is a well recognized exception to the hearsay rule but there is considerable difference of opinion as to the scope of the exception. The general exception is well recognized in Missouri. In Graham v. Stroh, 342 Mo. 686, 117 S. W. (2d) 258, a declaration against interest of a deceased person was held admissible. The Court adopted the statement from 22 C. J., Section 209: "Where a person makes a statement which is opposed to his own interest, an inference arises that such statement would not have been made unless it had been true, and evidence of such statement is for that reason received."

The appellants contend that this exception to the hearsay rule does not apply because Schilling was not deceased, but his testimony was not available because he refused to testify on the grounds that it would tend to incriminate him, and for the further reason that the

exception is limited to statements where the adverse interest is of a pecuniary or proprietary nature.

We have not been able to find any Missouri authorities on either of these propositions, which will be taken up in order. The rule was originally limited to declarations of deceased persons and it is still so limited in some jurisdictions. But we believe sound reasoning supports the doctrine of those decisions holding that whenever the testimony of the witness is unavailable as a practical proposition, his declaration should be received. This is what Wigmore on Evidence defines as the "Necessity Principle:" We approve the reasoning set forth in Section 1456 of the Third Edition: "The Necessity Principle, as here applied, signifies the impossibility of obtaining other evidence from the same source, the declarant being unavailable in person on the stand. Whenever the witness is practically unavailable his statements should be received. Death is universally conceded to be sufficient. The principle of Necessity is broad enough to assimilate other causes; but the rulings upon causes other than death are few. They are ill-judged, so far as they do not recognize the general principle of unavailability. Illness and insanity should be equally sufficient to admit the statements; as well as absence from the jurisdiction. Supervening incompetency through interest stands on the same ground."

In Weber v. C., R. I. & P. R. Co., 175 Iowa, 358, 151 N. W. 852 a declarant who had since become insane was held to be unavailable as a witness so as to render competent his declaration against interest.

In Harriman v. Brown, 8 Leigh (Va.) 697, a person who had made a declaration against interest was physically available as a witness but under the Virginia law was incompetent as a witness because he was the husband of a person who had a possible interest in the litigation. The court held that his declaration against interest should be admitted, stating: ". . . as he could not be compelled to testify, his admissions ought to be received as if he were dead."

In our opinion Schilling was just as unavailable as a witness as though he were dead and there is no reason why the rule of necessity should not be extended to this situation. In fact, the circumstances present a clearer safeguard than if Schilling were dead. The very fact that he was produced as a witness, but refused to testify on the grounds that it would tend to incriminate him, is an additional assurance that the affidavit was not a forgery or obtained by fraud or coercion. Presumably had such been the fact he would have taken the stand and repudiated the affidavit.

The next question is whether the affidavit can be regarded as a declaration against interest because it is not contrary to a proprietary or pecuniary interest. Again we have been unable to find any Missouri cases in point. But sound reasoning requires that the excep-

tion to the rule against hearsay be extended to this character of declaration. In every realistic sense it is a statement against interest.

In Wigmore on Evidence, 3d Edition, Section 1457, the reason for the exception is stated as follows: ''The basis of the Exception is the principle of experience that a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect, and is thus sufficiently sanctioned, though oath and cross-examination are wanting.''

Schilling's affidavit consisted of an admission that he had engaged in a fraudulent, shameful and criminal conspiracy culminating in perjury consisting of wholly fabricated testimony against a party to whom he was a stranger. This statement subjected him not only to the possibility of indictment and imprisonment, but to the prospect of being held up to public shame ▮ in his community. It is completely unrealistic to say that a statement of such character is not ''against one's interest'' and ''unlikely to be either deliberately false or heedlessly incorrect.'' Furthermore, while the sanctity of the oath may have meant very little to Schilling, he must have known that he was substantially adding to the apparent authenticity and veracity of the statement when he appeared before Guy N. Sone, a notary public and also the Circuit Clerk of the county in which he resided, and swore to the statement.

According to a historical review contained in Wigmore on Evidence, 3d Edition, Sections 1476, 1477, for nearly 200 years the English Courts had treated as admissible declarations which constituted an admission that the declarant had committed a crime. But in 1844, in the Sussex Peerage Case, 11 Cl. & F. 109, the House of Lords, without considering prior precedents, announced the rule that such a declaration could not be received as a declaration against interest. This was followed by subsequent English cases and this English rule was adopted in quite a few American states, but apparently the question has never been presented to this Court.

Wigmore points out the arbitrary nature of the distinction thus made in a lengthy discussion which appears to be unanswerable except on the basis of blindly adhering to the illogical English rule which has been followed by many American states. There have, however, been dissents against following this rule, the most famous of which is the dissenting opinion of Mr. Justice Holmes, with whom concur Mr. Justice Lurton and Mr. Justice Hughes, in Donnelly v. United States, 228 U. S. 243, 57 L. Ed. 820, 33 Sup. Ct. 449. This dissenting opinion is so short and so well reasoned that we set it out in full. ''The confession of Joe Dick, since deceased, that he committed the murder for which the plaintiff in error was tried, coupled with circumstances pointing to its truth, would have a very strong tendency to make any one outside of a court of justice believe that Donnelly did not commit the crime. I say this, of course, on the

supposition that it should be proved that the confession really was made, and that there was no ground for connecting Donnelly with Dick.—The rules of evidence in the main are based on experience, logic and common sense, less hampered by history than some parts of the substantive law. There is no decision by this court against the admissibility of such a confession; the English cases since the separation of the two countries do not bind us; the exception to the hearsay rule in the case of declarations against interest is well known; no other statement is so much against interest as a confession of murder, it is far more calculated to convince than dying declarations, which would be let in to hang a man, Mattox v. United States, 146 U. S. 140; and when we surround the accused with so many safeguards, some of which seem to me excessive, I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight. The history of the law and the arguments against the English doctrine are so well and fully stated by Mr. Wigmore that there is no need to set them forth at greater length. 2 Wigmore, Evidence, Sections 1476, 1477.'' Compare Rule 509 (1) American Law Institute Model Code of Evidence.

For the above reasons we hold the Schilling affidavit properly admisible as a declaration against interest.

It is urged that Schilling's affidavit stated facts which would render him liable in a civil suit for damages and that, if so, the risk of such a suit would render the affidavit a declaration against interest. There have been diverse views expressed on this point. See Weber v. C., R. I. & P. R. Co., 175 Iowa, 358, 151 N. W. 852 and Halvorsen v. Moon & Kerr Lumber Co., 87 Minn. 18, 91 N. W. 28, and also the contrary views expressed in 22 C. J. Sec. 215. We consider it unnecessary to rule this point.

Appellants contend that the affidavit was admitted only for the limited purpose of showing diligence on the part of the respondents. We do not so construe the discussion between counsel and the Court shown in the abstract. It appears to us that the Court was of the opinion that he could consider the affidavit only for the limited purpose of showing diligence by the plaintiffs but counsel for the plaintiffs also took the position that the Court had the right to consider the affidavit for additional purposes. In reviewing the evidence we treat the affidavit as substantive evidence on the issues of fraud and conspiracy.

We find the evidence of sufficient strength to meet the test announced in Terminal R. R. Assn. of St. Louis v. Schmidt, 349 Mo. 890, 163 S. W. (2d) 772. Under the evidence the action of the Chancellor in setting aside the judgment was proper and should be affirmed.

The record shows that Gertrude Easterly was innocent of the fraud perpetrated by her attorney and knew nothing of it. Accord-

ingly it would not be equitable to deny her a fair trial of her action for damages.

The judgment in the lawsuit and the judgment in the equity case setting aside the first judgment were obtained in the same court. Therefore in addition to affirming the equity judgment we order Gertrude Easterly's lawsuit reinstated on the docket of the trial court and set down for trial.

Judgment affirmed. All concur.