**UNITED STATES of America,
Plaintiff,**

v.

**Alfred DOVICO, Defendant.**

**No. 61 Cr. 813.**

United States District Court
S. D. New York.
Nov. 16, 1966.

**864**

Robert M. Morgenthau, U. S. Atty., S. D. New York, New York City, for the United States, Michael S. Fawer, Asst. U. S. Atty., of counsel.

Eric R. Roper, New York City, for defendant.

### OPINION

COOPER, District Judge.

This is a prosecution for violation of the Federal narcotics laws.

Alfred Dovico and Paul Gangi were jointly indicted on September 5, 1961.[1] The second count charged Dovico and Gangi with a sale of narcotics on January 10, 1961 in violation of Sections 173 and 174 of Title 21, United States Code.

After trial of Dovico alone [2] before Judge Sugarman, now Chief Judge, sitting non jury, Dovico was found guilty [3] and sentenced to ten years imprisonment as a second narcotics offender.[4] The conviction was affirmed upon appeal.[5] Because of newly discovered evidence, Judge Sugarman, after a hearing, vacated the judgement of conviction and ordered a new trial.[6]

New trial proceedings (concerned solely with count two) began before me without jury on June 6, 1966. The trial continued on June 7 and 9 when it was completed; decision was reserved pending submission by the parties of post-trial memoranda.[7]

During trial, pursuant to stipulations entered by the parties with consent of the Court, the following were made part of the trial record.[8]

(a) all proceedings, and papers filed in the proceedings had before Judge Sugarman subsequent to the defendant's original trial resulting in his conviction in December, 1964; and

(b) all proceedings, and papers filed in the proceedings had in connection with defendant's motion on June 24, 1966 to produce certain witnesses at trial at government expense pursuant to Rule 17 (b), F.R.Crim.P.

Upon review of the entire trial record, including the parties' post-trial memoranda, the Court, on August 16, 1966

---

1. The indictment was in three counts. The first charged Gangi with a sale of narcotics; the third alleged a conspiracy among Gangi, Dovico and others unknown, between January 1, 1957 and September 5, 1961, to violate the narcotics laws.

2. Gangi had pleaded guilty on all three counts in July, 1963. He was sentenced on August 26, 1963 to five years on each count, the sentences to be served concurrently. Dovico's trial began thereafter on September 10 and ended on September 17, 1963.

3. Judge Sugarman acquitted Dovico of the conspiracy charge contained in Count three of the indictment. See United

States v. Dovico, S.D.N.Y., 61 Cr. 813, findings filed October 11, 1963.

4. Judgment dated October 17, 1963.

5. United States v. Dovico, 329 F.2d 52 (2d Cir. 1964).

6. See United States v. Dovico, S.D.N.Y., 61 Cr. 813 memorandum #30614, filed December 7, 1964; order and opinion #30811, filed January 29, 1965.

7. The transcript of trial proceedings, June 6, 7 and 9, 1966 was filed on August 25, 1966. References to this transcript are indicated by "T." followed by a page number.

8. T. 352–353.

ruled in open Court on trial motions as follows: [9]

(a) The government's motion to strike certain out-of-court declarations by persons not called as witnesses was granted; and

(b) the defendant's motion for acquittal was denied and the defendant, upon the entire record, quantitatively and qualitatively, was found guilty as charged in count two of the indictment,

By this memorandum, the Court undertakes to formally dispose of both motions.

### DOVICO'S GUILT WAS ESTABLISHED BEYOND A REASONABLE DOUBT

■ The only material fact issue seriously raised at trial was whether Dovico supplied the narcotics which were the subject of the sale charged in count two. The Government contends he did. Defendant argues that the evidence is to the contrary; that Gangi himself procured the narcotics; and, in any event, the Government failed to sustain its burden of proof. We agree with the Government.

Briefly, it appears without significant dispute that on January 9, 1961, Raul Santiago, then a special employee for the Federal Bureau of Narcotics, proceeded to Paul Gangi's Pizza Shop in New York City and there paid to Gangi $550 for an ounce of narcotics which was to be delivered to Santiago at the Shop later in the evening. (T.20–21).

Gangi could not effect delivery on the 9th, but "guaranteed" it for the following day at 9:30 P.M. (T.23–4).

Santiago returned to the Shop at that time and asked Gangi "was it here yet" to which Gangi replied, "Take it easy." At about 10:15 P.M., Gangi commented that he could not understand "what's keeping this guy" and, after a telephone call, informed Santiago not to worry, "it will be here." Some twenty minutes later, Gangi received another telephone call and was heard by Santiago to say: "Hurry up, yeah, he's here." (T.25; see T.143–44).[10]

Shortly after 10:40 P.M., Gangi came from behind the counter, reached into a refuse can, and removed napkins and a brown package. (T.32, 146–47). He gave the brown package to Santiago, commenting "Be careful," and Santiago put it in his pocket and walked out of the Shop. (T.33, 37–38; see also 126–129).

Santiago proceeded to a subway station platform followed by an Agent. Santiago gave him the brown package which contained narcotics. (T.38, 187–188, Government Exhibit 3).

How did the narcotics get in the waste receptacle? Each of the government witnesses,[11] without contradiction, testified that about 10:40 P.M. on January 10th Dovico entered the Shop with a young girl (T.25–6, 144, 186, 225, 283). He ordered a slice of pizza for himself and the girl, and a pizza pie to take out.

■ Agent Avant saw Gangi place white paper napkins on the counter in front of Dovico (T.161). When he finished eating his slice of pizza, according to Santiago, whose testimony the Court credits,[12] Dovico removed a brown pack-

---

9. Transcript of Proceedings of August 16, 1966, pages 1–2.

10. The Government urges, and I find, that these remarks refer to Santiago's presence and that Gangi's supplier was being asked to hurry the delivery of the narcotics. Santiago had remained in the Shop under surveillance of Federal Narcotics Agents.

11. Raul Santiago; Agent Avant who was in the Pizza Shop on the 10th at all times Santiago was there; Agent Wilcocki who

had maintained a surveillance of Dovico on the night of the 10th; Agent Tripodi who viewed the activity in the Shop with binoculars from across the street; and Agent Ceburre.

12. Defendant urged that it was entitled to little credence, pointing to Santiago's background and failure to be consistent in describing details on direct and cross examination. Such is not of significant statute in the context of the total testimony. Indeed, had the direct testimony been recounted in haec verba about details

age from his pocket and "mashed" it with the napkins as he walked over to the waste receptacle. Although none of the Agents testified to seeing the brown package in Dovico's hand, Agents Avant and Tripodi, from varying vantages, saw Dovico take the white napkins, proceed to the refuse can and deposit therein whatever he held.[13] It was immediately thereafter that Gangi came from behind the counter and pulled a brown package from the can and gave it to Santiago (T.32–33).[14]

### Defendant's Contentions

As was Dovico's constitutional right, he did not testify at his first trial or before me. At his first trial, his defense was alibi—that he was at work. It "was not sustained because the records of his employer failed to indicate that Dovico was working on the night of January 10, 1961 when all of the government's witnesses placed him in Gangi's shop." United States v. Dovico, opinion #30811, p. 3, S.D.N.Y., filed January 29, 1965. From the proof adduced against him at the second trial, he now argues that he was there on that evening. Needless to add, this variance in no way entered into the Court's verdict based solely on the proof adduced.

Although neither Santiago nor Agent Avant examined the receptacle before Dovico entered the Shop (T.111, 158), we cannot agree with defense contentions that: (a) the narcotics had been placed in the receptacle prior to Dovico's entrance; (b) Gangi was waiting for an "opportune" time to effect delivery to Santiago; and (c) Dovico's presence was therefore a "coincidence" having no relation to the crime. (Defendant's Post-Trial Memorandum, p. 31).

First, both Agent Avant and Santiago testified that no one other than Dovico and then Gangi had gone to the receptacle during the evening of the 10th. (T.48–49, 167). Next, Gangi's actions, his remarks to Santiago and his statements over the telephone on the 9th and 10th, coupled with Dovico's actions on the 10th, the fact that Dovico drove a Rambler, had red hair and answered to the nickname "Red" and lived in the vicinity where Gangi had sought him out on the 9th, are persuasive circumstances negativing the contention that Dovico's presence in the Shop was "coincidental."[15] Finally, if Gangi had narcotics "in stock," and was not awaiting delivery, the record discloses no reason for delaying Santiago. The purchase price had been paid on the 9th, Santiago and Gangi were not strangers. They had dealt with each other previously. Then, too, the Shop seemingly provided the operating area for illicit narcotics transactions. Nothing appears to have made the "time" of Dovico's presence more "opportune" than any other on the 9th or 10th.

There was, however, other evidence received at trial, subject to a motion to strike as hearsay, which, if properly admitted, the defendant contends creates a reasonable doubt as to his guilt. Although for reasons which we deal with later, this evidence was stricken, it should be noted here that, assuming the hearsay objection had been overruled, Gangi's statement to the effect that Dovico is innocent of the crime and that he, Gangi, had put the narcotics in the receptacle, is devoid of credibility and of insufficent weight to lead this Court to find the reasonable doubt pressed by the defense.

---

almost six years prior to trial, the contrary inference, that his story was contrived, may have been warranted.

13. The testimony of the Agents buttresses that of Santiago even though they had not observed the "crumpling" or "mashing" gesture. (T.164–9, 267).

14. In this connection, the absence of Dovico's fingerprints on the brown bag, as

revealed by an F.B.I. Latent Fingerprint Report, alone or with other evidence does not raise a doubt founded in reason that he did not place it in the receptacle.

15. The full details are not reproduced here. Their cumulative effect is overwhelming. See Government's Post-Trial Memorandum, Point I.

Accordingly, employing the statutory inference I am permitted to make under 21 U.S.C. § 174,[16] I find that each of the elements required for a conviction under 21 U.S.C. §§ 173 and 174[17] has been satisfied by the government beyond a reasonable doubt and that the defendant stands convicted as charged.

## GANGI'S OUT-OF-COURT DECLARATIONS WERE INADMISSIBLE AS HEARSAY

### 1. *Motion for a New Trial*

Before Dovico's original trial in September, 1963, Gangi had pleaded guilty (July 29, 1963), was sentenced and then committed to Danbury Correctional Institution. After Dovico's conviction had been affirmed, he moved pursuant to Rule 33, F.R.Crim.P., for a new trial on the ground of newly discovered evidence. In Judge Sugarman's opinion and order of January 28, 1965, granting a new trial, he wrote (pp. 3–8):

"The motion was predicated upon an affidavit of Raphael Plattner sworn to July 31, 1964, which stated that between February 13, 1964 and March 19, 1964, while Plattner was an inmate of Danbury * * * he became friendly with Gangi who told Plattner that Dovico was innocent of the crime for which Dovico had been convicted and that, although Dovico was in Gangi's shop on the night of January 10, 1961, Dovico did not place any narcotics in the refuse receptacle but that he, Gangi, had done so alone in preparation for the sale to Santiago. Plattner further stated that the reason

Gangi ascribed for warning Dovico's lawyer, who had subpoenaed Gangi as a witness at Dovico's [first] trial, that if Gangi was put on the stand he would "bury" Dovico, was Gangi's fear that if he told the truth from the stand the federal agents would charge Gangi with violations of the narcotics laws other than those to which Gangi had pleaded guilty.

\* \* \* \* \* \*

"The government submitted affidavits of agents * * * and two assistant United States attorneys, denying that any pressure had ever been exerted on Gangi to dissuade him from testifying at Dovico's trial. There was also submitted in opposition, an affidavit of Gangi sworn to October 5, 1964 in which he stated:

'On October 1, 1964, in the presence of my attorney, * * * I read an affidavit signed by one Raphael Plattner. This affidavit related the details of an alleged conversation between Plattner and myself. On that same date, I was also shown two photographs of an individual identified to me as Raphael Plattner. I recognized the photographs as those of an individual I may have seen during my stay at * * * Danbury * * *

'I wish to state that I never at any time spoke to Mr. Plattner concerning the facts and circumstances set forth in his affidavit. Any such statements attributed to me are completely untrue.'

"Dovico's attorney submitted a reply affidavit reciting that Plattner had told the attorney that there were other

16. 21 U.S.C. § 174 provides: "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

17. 21 U.S.C. § 173 provides in pertinent part: "It is unlawful to import or bring any narcotic drug into the United States * * *; except that such amounts of crude opium and coca leaves as the Com-

missioner of Narcotics finds to be necessary * * *." Section 174 also provides: "Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States * * * contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts * * * shall be imprisoned * * *."

witnesses to Plattner's conversations with Gangi."

\*   \*   \*   \*   \*   \*

Judge Sugarman scheduled a hearing on the motion for December 30, 1964 by memorandum dated December 7th. On the 11th, Plattner swore to a further affidavit alleging attempts by the government to have him recant charges and statements made in his original affidavit. Later, when counsel for both sides were unable to meet the schedule set for the hearing on the 30th, Judge Sugarman filed a suupplemental memorandum, on December 23rd, deferring the hearing to January 18, 1965.

In that same opinion, Judge Sugarman sets forth subsequent events:

" \* \* \* [O]n the night of December 23, 1964 Gangi died of a heart attack at Danbury.

"A hearing was held \* \* \* on January 18, 1965 and concluded on January 26, 1965. Plattner and six other witnesses, all inmates of Danbury in February and March 1964, testified. Some sharply contradicted the inference in Gangi's affidavit that Plattner was known to Gangi only by sight, if at all, and some sharply contradicted Gangi's denial of having discussed the Dovico matter with Plattner." [18]

Judge Sugarman, after the hearing, found in part that the evidence of Gangi's statements to Plattner was in fact newly discovered, was neither cumulative nor impeaching; was material to the issues involved "because it exculpates Dovico"; and "[i]t would probably produce an acquittal." [18]

However, as Judge Sugarman stated, "before Gagi's statements of Dovico's innocence could create a reasonable doubt and thus probably produce an acquittal,

they would have to be admissible." The statements having been made out-of-court and Gangi being dead, Plattner's courtroom testimony would be hearsay in so far as Gangi's statements were offered for their truth unless an exception to the hearsay rule applied. In a challenging analysis, Judge Sugarman, for the first time in a written decision (as called to this Court's attention) squarely sanctioned as an exception to the hearsay rule a declaration against the declarant's "social" interest—one which would create the "risk of making him an object of hatred, ridicule or social disapproval in the community." [19] Regarding the circumstances on the record before him sufficient to make Gangi's statements admissible under such an exception, Judge Sugarman decided not to direct an acquittal. "[R]ather, because [of] the long interval between the trial (September 10, 1963) and the hearing on the motion (January 18, 1965) and Gangi's death" he was "persuade[d] \* \* \* that the better course would be for a trial de novo."

2. *Hearsay Exception Where Declarant's Statements Subject Him to Community Scorn*

The parties agree that Gangi's statements of Dovico's innocence and his own placing of the narcotics in the receptacle (offered through the testimony of Plattner and other Danbury inmates for the truth of those assertions) constitute hearsay.[20]

Defendant argues that "the Court should judicially recognize, as an exception to the hearsay rule, statements by third party, out of court declarants, which subject the declarant to disgrace and the clear possibility of being despised within the community in which he resides; the quantum of evidence herein does show that Gangi's statements had

---

18. Opinion #30811, note 6, supra, at p. 3.

19. Opinion #30811, note 6, supra, at p. 3.

20. Defendant has not argued that, aside from their truth, the very fact such declarations were made itself raises a reasonable doubt as to the guilt of Dovico.

Despite Gangi's affidavit denying making the statements, we well assume throughout that he *did so*. We *do not* regard the "fact" of making the statements, independently, or in context with the record as a whole, as *raising such doubt*.

this effect in the prison community where he was incarcerated; [and] full weight should be given to Gangi's statements by the trier of fact in determining the innocence of Mr. Dovico * * *."

The Government, on the other hand, contends that no such exception should be judicially recognized; that if it is, no testimony should be admitted thereunder unless circumstantial trustworthiness is ensured and the record herein does not do so; and even if Gangi's statements would be admissible, they are entitled to no weight" since they are inconsistent with other uncontradicted evidence * * of Dovico's guilt."

■■ An initial question is whether we are bound on the issue of admissibility by the prior decision on the motion for a new trial before Judge Sugarman.

Judge Sugarman's opinion and order filed January 29, 1965 does not purport to finally determine admissibility on the new trial. The question there was whether, if a new trial be granted, new evidence could be produced which would probably effect an acquittal. Judge Sugarman, because of Gangi's death and the time which had elapsed between the original trial and the motion saw fit to direct a trial de novo. Wigmore notes that upon motions for a new trial, different evidentiary rules have been applied, 5 Wigmore, Evidence § 1476 (3rd Ed. 1940), the immediate concern being with a possible miscarriage of justice and the probability of rectifying such error at a retrial. Our system of law would require no less.

However, even if we read Judge Sugarman's persuasive disposition as setting a rule to be followed at the retrial, we cannot conclude that it determines the law of the case concerning admissibility of evidence, such question resting in the discretion of the trial judge. See LeRoy v. Sabena World Airlines, 344 F.2d 266, 274–275 (2d Cir. 1965); Dictograph Products Co. v. Sonotone Corp., 230 F.2d

131 (2d Cir.), cert. denied, 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956); Ross Products, Inc. v. New York Merchandise Co., 242 F.Supp. 878 (S.D.N.Y.1965). On this view, not questioned by the parties, the issue of admissibility of Gangi's statements has been fully briefed and the Court has undertaken independent research.

In criminal trials, Rule 26, F.R.Crim. P., provides that:

* * * [t]he admissibility of evidence * * * shall be governed * * * by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

According to the Notes of the Advisory Committee on Rules, this "rule contemplates * * * a uniform body of rules of evidence * * * [which] * * * may be modified and adjusted from time to time by judicial decisions."

■ It is uniformly recognized that hearsay is inadmissible in evidence unless within an exception to the rule. The rationales, variously given and with differing emphasis, have been that in the search for truth, hearsay lacks readily discernible safeguards: the utterance on declarant's oath; inability of the fact-finder to gauge demeanor; no responsibility on the declarant for error or falsification; and no opportunity for the opponent to cross-examine in search of motives of the declarant and to test his testimonial capacity.

■ One common law exception to the hearsay rule is referred to as the declaration against interest exception.

■■ Whether the exception is satisfied so that the declaration is admissible as a matter of law is preliminarily a question of fact for the Court. Here, it cannot be found that Gangi's statements were against those interests traditionally recognized as satisfying the exception: the declarant's pecuniary or proprietary interests.[21] Nor can they be

---

21. On the requirement that the interest be proprietary or pecuniary, see 5 Wigmore, Evidence (3d Ed. 1940) § 1455; 2 Mor-

gan, Basic Problems of Evidence 290; 2 Jones on Evidence (5th Ed. 1958) § 296; McCormick, Evidence (1954) § 253;

found to be subsumed in the extension of the exception to penal interests, now recognized by a growing number of state jurisdictions [22] and suggested by a few federal decisions.[23] This is so because at the time of Gangi's statements he had already pleaded guilty to the instant indictment and was sentenced thereon. Moreover, it can hardly be said that federal authority supports the admissibility of hearsay declarations against penal interest.

In Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913),[24] the leading federal decision on the insufficiency of the penal interest to qualify under the hearsay exception,[25] the Supreme Court sustained the exclusion from evidence of the testimony of one Norris that one Dick, who had died prior to trial, had confessed his own guilt of the murder for which defendant Donnelly was convicted. Mr. Justice Pitney, for a divided court, noted (pp. 273–276, 33 S.Ct. p. 460):

> In this country there is a great and practically unanimous weight of authority in the state courts against admitting evidence of confessions of third parties, made out of court and tending to exonerate the accused.[26]

> We do not consider it necessary to further review authorities, for we deem it settled by repeated decisions of this court, commencing at an early period, that declarations of this character are to be excluded as hearsay.[27]

Mr. Justice Holmes dissented in an opinion with which Justices Lurton and Hughes concurred (pp. 277–278, 33 S.Ct. p. 461):

> The confession of Joe Dick, since deceased, that he committed murder for which [the defendant] was tried, *coupled with circumstances pointing to its truth*, would have a very strong tendency to make anyone outside a court of justice believe that Donnelly did not commit the crime. *I say this, of course, on the supposition that it should be proved that the confession really was made, and that there was no ground for connecting Donnelly with Dick.* * * * There is no decision by

Jefferson, Declarations Against Interest: An Exception to the Hearsay Rule, 58 Harv.L.Rev. 1 (1944); Orfield, The Hearsay Rule in Federal Criminal Cases, 32 Fordham L.Rev. 499, 769 (1964); Note, 162 A.L.R. 446 (1946); see Fisch, New York Evidence (1959, 1965 Cum. Supp.) Chap. 26.

22. The most recent decision doing so is People v. Spriggs, 60 Cal.2d 868, 36 Cal. Rptr. 841, 389 P.2d 377 (opinion by Traynor, J., collecting cases and adopting Wigmore's view that the exclusion of declarations against penal interest now rests only on the historical accident of a mistaken headnote in an early English decision); see also People v. Lettrich, 413 Ill. 172, 108 N.E.2d 488 (1952) (murder prosecution; third-party confession; "special circumstances" rule); Thomas v. State, 186 Md. 446, 47 A.2d 43, 167 A.L.R. 390 (1946) (murder; witness' confession admissible); Sutter v. Easterly, 354 Mo. 282, 189 S.W.2d 284 (1945); Brennan v. State, 151 Md. 265, 134 A. 148 (1926) ("special circumstances" rule).

23. See Mason v. United States, 257 F. 2d 359 (10th Cir.), cert. denied, 358 U.S. 831, 79 S.Ct. 52, 3 L.Ed.2d 69 (1958); Sucher Packing Co. v. Manufacturer's Cas. Ins. Co., 245 F.2d 513 (6th Cir.

1957), cert. denied, 355 U.S. 956, 78 S.Ct. 541, 2 L.Ed.2d 531 (1958). Contra, Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913).

24. Prosecution for a murder on an Indian Reservation. At trial, defendant tried to show that Joe Dick was dead and circumstances pointed to Dick as the murderer: Dick lived in vicinity; footprints at the scene led to place Dick was stopping at the time, not toward defendant's home; Dick suffered from consumption and along side the footprints was an impression of someone sitting down, as if from shortness of breath.

25. For earlier cases, see, e. g., United States v. Mulholland, 50 F. 413, 416 (D. Ky.1892), appeal dism. 149 U.S. 782, 13 S.Ct. 1050, 37 L.Ed. 963 (1893); United States v. McMahon, 26 Fed.Cas. 1131 (No. 15699) (C.C.D.C. 1835). In both the declarant was unavailable.

26. Citing cases from 16 states, four of which have since changed the rule where the confession is against the declarant's penal interest. See People v. Spriggs, supra, note 25, overruling People v. Hall, relied upon in Donnelly.

27. See also, Jefferies v. United States, 215 F.2d 225, 226 (9th Cir. 1954).

this court against the admissibility of such a confession; * * * no other statement is so much against interest as a confession of murder; it is far more calculated to convince than dying declarations, which would be let in to hang a man. * * * The history of the law and the arguments against the English doctrine are so well and fully stated by Mr. Wigmore that there is no need to set them forth at greater length. [Emp. added]

As Judge, Sugarman stated in granting a new trial herein:

The Donnelly decision has not set well with text writers on Evidence. Wigmore strongly condemns it as "shocking to the sense of justice," an "absurdity and wrong" and "a barbarous doctrine." [citing 5 Wigmore on Evidence (3rd ed. 1940) 289, 290]. The grotesque result that was achieved in [Royal Ins. Co. Ltd. v. Taylor, 254 F. 805 (4th Cir. 1918)] * * * was characterized by Wigmore as "an intellectual disgrace to our system of Evidence." [5 Wigmore on Evidence (3rd ed. 1940) 284].[28]

The Government, in urging that the very hesitancy of the judiciary in recognizing the "penal" interest should give pause in considering the exception here pressed by defendant, cites as "stare decisis" the recent Second Circuit decision in D'Ercole v. United States, 361 F.2d 211 (2d Cir. May 19, 1966), notice of filing pet. for cert. October 7, 1966, wherein the Court stated:

In support of his allegation that the Government knowingly used perjured testimony to bring about his conviction, D'Ercole attached to his petition an affidavit made by another prisoner in which the affiant related conversations which he had with D'Ercole's co-defendant, John Cimino, in which Cimino allegedly admitted to the affiant that he, Cimino, had been coerced by federal agents to implicate D'Ercole and to testify against him, although the agents well knew that D'Ercole was innocent. If what Cimino is supposed to have said was in fact true, then, of course, the appellant was denied due process under the Fifth Amendment * * * and he would be entitled to relief under § 2255 and a new trial. *The difficulty is that the affiant's statement of what John Cimino said does not qualify as proper evidential material to support a petition under § 2255 because it is hearsay and could not be used at a hearing.* See United States v. Pisciotta, 199 F.2d 603, at 607 (2d Cir. 1952). [Emp. added].

We do not regard this decision as controlling because there, unlike here, there is no showing of the unavailability of the declarant. In any event, the nature of the interest raised by defendant here should be examined upon its own terms.

### 3. *The "Social Interest" Exception to the Hearsay Rule*

This rule has been loosely referred to as the "social interest" exception to the hearsay rule.[29] As formulated in the

---

**28.** See the opinion of Friendly, J. in United States v. Annunziato, 293 F.2d 373, at p. 378, where he characterizes the refusal to recognize penal interests under the exception as "indefensible." See also, Sucher Packing Co. v. Manufacturer's Cas. Ins. Co., supra, note 23, 245 F.2d at 521: "It might well be * * * that, in light of adjudications during the 44 years that have elapsed since the Donnelly case, the views once voiced in the prevailing opinion in that case, would no longer hold; * * *." In *Sucher,* however, the admissibility ruling was at best harmless error and could have been justified on pecuniary interest grounds; See also, the opinion of Murrah, Ch. J., in Mason v. United States, supra, note 23: "* * * Assuming, however, that * * * [x] * * * did make a voluntary * * * statement * * * exculpating * * * the accused, modern and convincing authorities support its admissibility as a statement of fact against penal interests. [citations] But, there is no showing that the statement, if made, was voluntary and against the penal interest of the declarant. * * *"

**29.** See, e. g., Wright, Uniform Rules and Hearsay, 26 U.Cinn.L.Rev. 575 (1957).

Model Code of Evidence [30] and in the Uniform Rules of Evidence Act,[31] a

> * * * declaration is against the interest of a declarant if the judge finds that the fact asserted in the declaration * * * created such a risk of making him an object of hatred, ridicule or social disapproval in the community that a reasonable man in his position would not have made the declaration unless he believed it to be true.

Such an exception to the hearsay rule has not been without its supporters. Professor Jones' treatise states that "[d]eclarations of facts which would *tend to* make the declarant an object of hatred, ridicule, or social disapproval, should on reason be admissible as against the social interest of the declarant * * *."[32] This is particularly so if the notion of untrustworthiness provides the major rationale for the exclusion of hearsay:[33]

> * * , * a person will not concede even to himself the existence of a fact which will cause him substantial harm unless he believes that the fact does exist. *If this theory is plausible* there

seems no valid reason for not extending the exception to include statements against penal interest and those which would subject the declarant to hatred, ridicule, contempt or *social ostracism* * * *.[34] [Emp. added].

In this regard, it has been said that

> * * * it requires no argument to convince that the realization of such a consequence is generally a much more powerful influence upon conduct than the realization of legal responsibility for a sum of money.[35]

The assertion is not without persuasion. We need only reflect on the volume of blackmail cases prosecuted annually to gauge the unfortunate number in our population who, to a degree, prefer payment to revelation of one ugly episode in their life's experience.

■ In any event, despite the estimate of the logic advanced in the texts, as of 1952, Professor Morgan could report that

> [n]o case has been found which even intimates that a declaration of a fact

30. Model Code of Evidence, Rule 509(1) (1942) and see illustration (4) thereto.

31. Uniform Rules of Evidence Act, Rule 63 (10) 9A U.L.A. 635, 637 (1965).

32. Jones, Evidence (5th ed. 1958) § 296 (Emphasis added) (Noting that "few courts have extended the rule so far," and citing State v. Alcorn, 7 Idaho 599, 64 P. 1014; Sutter v. Easterly, 354 Mo. 282, 189 S.W.2d 284, 162 A.L.R. 437; "but see" State v. Gorden, 356 Mo. 1010, 204 S. W.2d 713).

33. The refusal to recognize a penal interest as sufficient to meet the declaration against interest exception has been said to rest not on a theory that the declaration is untrustworthy or lacks probity, but because of the danger of fabricated testimony, particularly in a criminal case. See, e. g., 5 Wigmore, Evidence (3d ed. 1940) § 1457 (criticizing the rationale); Fisch, New York Evidence, § 894 (1959); Note, 162 A.L.R. 446, 447 (1946) ("[O]ffers to prove extrajudicial confessions of guilt on the part of persons * * * of dubious reputation who by death * * * [are] removed from the reach of the court, are almost as common as alibi testimony.").

34. Donnelly, The Hearsay Rule and its Exceptions, 40 Minn.L.Rev. 455, 475 (1955) (Would there be a substantive difference between social "disapproval" and social "ostracism?") ; see also Jefferson, Declarations Against Interest, 58 Harv.L.Rev. 1, 39 (1944); McCormick, Law of Evidence, § 256, p. 551 (1954) ("Declarations against social interest, such as acknowledgements of facts which would subject the declarant to ridicule or disgrace, or facts calculated to arouse in the declarant a sense of shame or remorse, seem adequately buttressed in trustworthiness and should be received.")

35. Morgan, Declarations Against Interest, 5 Vanderbilt L.Rev. 451 (1952). See also, McCormick, supra, note 34 at p. 551 (" * * * the restriction to material interests, ignoring as it does other motives just as influential upon the minds and hearts of men, should be more widely relaxed.") ; Comment, 31 N.Y.U.L.Rev. 1100, 1122 (1956) (" * * * Surely, a statement which might subject its maker to * * * social ostracism is at least as reliable as one that threatens only his pocketbook.") Especially this would seem so where the amount involved is relatively limited. See McCormick, supra, § 254.

which would subject a declarant to hatred, ridicule, contempt, or social ostracism falls within the exception.[36]

Besides the influential opinion by Judge Sugarman on the motion herein for the new trial, the research of the Government as disclosed by its brief and that undertaken by the Court discloses no such reported case decided thereafter. Defendant cites two decisions, in no way controlling, which are suggestive, but do not hold on the exception here advanced.[37]

Defendant would have this Court declare that "third-party out-of-court declarations subjecting the declarant to disgrace and the clear possibility of being despised within the community in which he resides" constitutes a declaration admissible as an exception to the hearsay rule. (Point I of Defendant's Post-Trial Memorandum).

It should be noted that, as thus formulated, the rule differs from the Model Code—Uniform Act proposal. Defendant's contention eliminates what the Court during trial found immediately objectionable: the notion of "social disapproval" which suggests that a mild community reaction, or risk thereof, perhaps limited to negative comment alone, could provide a circumstantial guarantee of trustworthiness sufficient to support the exception. Mr. Justice Pitney, discussing hearsay generally in Donnelly v. United States, supra, quoted from Mina Queen and Child v. Hepburn, 7 Cranch 290, 295–297 (1813):

That [t]his species of testimony supposes some better testimony which might be adduced in the particular case, is not the sole ground of its exclusion. Its intrinsic weakness, its in-

competency to satisfy the mind of the existence of the fact, and the frauds which might be practised under its cover, combine to support the rule that hearsay evidence is totally inadmissible. * * * The danger of admitting hearsay evidence is sufficient to admonish courts of justice against lightly yielding to the introduction of fresh exceptions to an old and well-established rule, the value of which is felt and acknowledged by all.

Put differently, in a varying context, Mr. Justice Rutledge, for the Court in Kotteakos v. United States, 328 U.S. 750, 761, 66 S.Ct. 1239, 1246, 90 L.Ed. 1557 (1946), recognized that the hearsay rule "is often grossly artificial," but cautioned that it also "may be the very essence of justice, keeping out gossip, rumor, unfounded report, second, third, or further hand stories."

It is just such chit-chat that causes concern here. Though well and good to logically examine generalized evidentiary rules, the trial court's primary burden is to properly particularize them in the concrete situation moulded in each case. On the record here, the evidence of Gangi's statements do not even approach minimal criteria for the exception defendant urges, or similar criteria (such as the Model Code rule), which the Court generally accepts in principle. Before briefly illustrating this finding, attention is merited on the proposed formulation.

The Model Code—Uniform Act proposal requires the Court to find that a reasonable man would in declarant's position, not have made the declaration unless he believed it to be true; further,

<hr/>

**36.** Morgan, supra, note 35, at p. 475. Of course, the absence of authority in support of the proposed rule would not prevent modifying or adjusting common law principles "in the light of reason and experience." Rule 26, F.R.Crim.P. See Opinion #30811, supra, note 6, at p. 11.

**37.** Our view is that in State v. Alcorn, 7 Idaho 599, 64 P. 1014 (1901) the admis-

sibility ruling rests on the res gestae exception to the hearsay rule. As for Sutter v. Easterly, 354 Mo. 282, 189 S.W. 2d 284, 162 A.L.R. 437 (1945), the Court in a reasoned opinion found a penal interest sufficient under the declaration against interest exception.

that the defined risk occur "in the community."

Defendant, on the other hand, does not focus on the risk at the time of the declaration, but rather on the facts that the declaration subjects him to disgrace *and* the clear possibility of being despised. Further, that this reaction and risk occur in the community in which he resides.

■ Neither set of formulations seem fully satisfactory, perhaps because, unlike the proprietary or pecuniary interest, the type here involved is not so susceptible of precise calculation or measurement. However, as to the Model Code —Uniform Act version, the possibility of a subjective test of the declarant's state of mind should not be foreclosed. If evidence be available that he, peculiarly, entertained the fear that the defined risk would result, the declaration should be admissible. Truth emerges from the most unlikely sources, as prosecutors conducting underworld investigations and probation officers, daily dealing with their charges, frequently report. On the other hand, defendant's formulation would require the risk to be, in part, realized. While its realization is evidential of declarant's perception of the risk (as is a man's action evidential of his intent), this factor goes more to weight than deserving separate treatment as a condition of admissibility.[38]

Finally, attempting to specify the relevant "community" in which the defined risk is to be perceived or realized is one over which the law of anti-trust has no monopoly. In ruling on reception of reputation evidence, the problem arises frequently, and unreviewed trial decisions may not seem wholly consistent unless viewed in their discreet contexts.

With regard to the community concept here, which inevitably would have to be particularized in each case, a prison residence need not be a sufficient demarcation. Organized crime, as in part of the illicit narcotics trade, has communication links which, in effect, permit what may occur within the walls of confinement to have repercussions without. Although the defined risk may have a more readily discernable impact in the prison community, where the period of confinement is short, the outside reaction may be the one perceived.

■ In this case, however, we formulate the technical rule, we are persuaded on the total record—including that on the hearing on the motion for a new trial, that Gangi's statements were not made in circumstances sufficient to warrant their admissibility for the weight they may deserve.[39] In so finding, we disregard, arguendo, Gangi's affidavit denying that the statements were in fact made; indeed, we assume that they were. There is not a scintilla of evidence that Gangi perceived any risk of disgrace or being despised. His revelations were openly made, in front of several inmates (if their testimony were to be accepted), in the prison courtyard and over the dining table.

Moreover, the record does not foreclose a possible plethora of mixed motives for his belated desire to be of aid to Dovico. There was long friendship between them. Dovico was to be sentenced to a minimum of ten years imprisonment. If Gangi were telling the truth in exculpating him

---

38. See 5 Wigmore, Evidence (3d ed. 1940) § 1462; Compare, Jefferson, Declarations Against Interest, 58 Harv.L.Rev. 1 (1944) and Fisch, New York Evidence, (1965 Cum.Supp.) § 892 (citing Ellwanger v. Whiteford, 15 A.D.2d 898, 225 N.Y.S.2d 734, (1962), aff'd 12 N.Y. 2d 1037, 239 N.Y.S.2d 680, 190 N.E.2d 24 (1963) for the "now clear" point that New York requires as a condition of admissibility that declarant realize the facts

were against his interest at the time they were stated.

39. As stated above, page 12, even had they been admissible, their weight was such that the Court is of the view that the Government established Dovico's guilt beyond a reasonable doubt. In particular, we look with distrust upon the testimony of Plattner (defense witness-in-chief) and accordingly reject it.

would the "word" get around about the ill turn he did at trial? Was Gangi taking liberties with the truth to "bail out" a friend? Were Gangi's statements motivated by the feeling he could ameliorate his relation with some inmates who, because of what they regarded as his relatively "light" sentence, thought he must have "cooperated" with the Government? (See T. 477).

Evidence of equal potency is the actual reaction of the fellow inmates when the declarations were made over a period of time.[40] A sample of the testimony of the key defense witness speaks eloquently on the absence of the very elements defendant urges we find (T. 426-430):

*Raphael Plattner* (Cross)

    \*    \*    \*    \*    \*    \*

Q. He at that point tells you that Mr. Dovico allegedly is innocent that he alone is guilty, and that he is ready at that point to help in any way he can to rectify this wrong?

A. Yes, sir.

Q. Is is not a fact in the eyes of you, Mr. Scorzello, Mr. Jacovino, and the other people, this is a rather noble gesture on his part?

A. It certainly is.

Q. Didn't you think rather highly of him for coming forth with this?

A. Well, I though highly and not so highly of him, also.

Q. Why not?

A. Because that he didn't reveal this sooner or attempt to do it any sooner.

Q. Did you ostracize him socially?

A. I didn't.

Q. Did Mr. Scorzello?

A. The clique that we were in didn't.

    \*    \*    \*    \*    \*    \*

Q. Did you hate Mr. Gangi for what he had not done?

A. For what he had not done, did I hate him?

Q. Yes.

A. No, sir.

Q. Isn't it for what he had not done as opposed to what he did do?

A. I didn't hate him.

Q. You did not?

A. No.

Q. You were friends with him after that, weren't you?

A. I was friendly with him, yes.

Q. Didn't you spend all your—didn't you eat with him all the time?

A. Yes, I did.

Q. Did you go to the library with him?

A. Yes.

Q. Spend your recreation with him?

A. Yes.

Q. And isn't the same true of Jacovino and Scorzello?

A. Yes, sir.

Q. And other people?

A. Yes, sir.

Q. Do you know of anyone who shunned him in that prison community for the fact he had told of Dovico?

A. Well, this wasn't spread out over the prison, it was just in our own group.

Q. So the only people who knew about it who would be representative of the community in this group would

---

**40.** It should be noted that at trial no attempt was made to prove the truth of the charges that Gangi was pressured or co-erced by the Government into furnishing his affidavit wherein he denied making the statements.

be the four of you, including Mr. Gangi?

A. And some others who weren't so close to us.

Q. And you continued to be friendly with him?

A. Oh, yes, up until the time when I was to leave when I was still composing the letters for him I was friendly with him.

\*  \*  \*  \*  \*  \*

This testimony on cross does not, in our view, substantially differ from that on Plattner's direct examination;[41] nor did other defense witnesses on this score provide a basis for a contrary finding.[42]

Whatever may be the general mores of prison society as a whole, as revealed by the inmates who testified or the views of penologists cited in defendant's post-trial memorandum,[43] they do not supply the vital foundation evidence demonstrating the risk Gangi himself could reasonably be thought to perceive nor does it establish, alone, the relevant community reaction in which it is to be gauged.[44] It occurs to us that if the prison inmates were aware, as contended, of additional imprisonment facing Gangi if he attempted earlier to "clear" defendant, they would condone his silence. The caution, "First look out for yourself" rates very high in that environment. Moreover, at the time of Gangi's alleged statements, Dovico had already been convicted and sentenced. Could it be that Gangi feared the reaction of fellow inmates if Dovico were committed to Danbury? In this context, there would be no circumstantial guarantee of trustworthiness.

Accordingly, for each of the reasons above, the motion by the Government to strike the defense testimony as to Gangi's statements was granted.

41. See, e. g., T. 478 (questioning by the Court).

42. See, e. g., T. 470–72; 492–94.

43. Page 18 ff.

44. We do not, therefore, pursue the points made by the Government concerning

Gangi's motives to falsify; the limitation of any "social" interest exception to "special circumstances;" and the lack of corroboration of the purported Gangi statements.