W. H. BARBER COMPANY, Respondent,

v.

McNAMARA–VIVANT CONTRACTING
COMPANY, INC., and Bituminous
Materials, Inc., Appellants.

No. 48236.

Supreme Court of Minnesota.

July 27, 1979.

Rehearing Denied Sept. 25, 1979.

Larkin, Hoffman, Daly & Lindgren and James P. Larkin and James Strother, Minneapolis, for appellants.

Dorsey, Windhorst, Hannaford, Whitney & Halladay and Thomas Tinkham and Jay Bennett, Minneapolis, for respondent.

Heard before ROGOSHESKE, PETERSON, and SCOTT, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

This case arose out of an action by plaintiff, W. H. Barber Company (Barber), against defendants McNamara-Vivant Contracting Company, Inc. (MV) and Bituminous Materials, Inc. (BMI) for asphalt goods sold and delivered to defendants in 1974. Defendants admitted receiving these goods but counterclaimed against plaintiff, seeking damages for plaintiff's refusal to deliver asphalt materials to defendants in October 1973, pursuant to an alleged requirements contract between the parties, and for the alleged failure of plaintiff to provide price protection on asphalt material for work not completed in 1973 and carried over into 1974.

The case was submitted to a jury on a special verdict. The jury found that plaintiff's employees agreed to provide price protection in the amounts stated in defendants' counterclaims; that a requirements contract had been entered into in 1973, but that its breach by plaintiff resulted in no damage to defendants; and that defendants did not protest plaintiffs' 1-percent-per-month service charge, which applied to goods delivered in 1974.

In its order on post-trial motions, the trial court held defendants' counterclaims for carryover price protection were barred by the Uniform Commercial Code Statute of Frauds, Minn.St. 336.2–201; set aside the jury's finding that the parties entered into a requirements contract for 1973; and held that defendants accepted plaintiff's 1-percent-per-month service charge by failing to object to that term before placing orders for asphalt materials.

Defendants now appeal from the trial court's denial of defendants' motion for a new trial on the questions of whether the agreements for price protection were enforceable and whether the imposition of the service charge was proper. We affirm.

I. Defendants' Counterclaims

Plaintiff Barber is a distributor of asphalt cement and defendants BMI and MV are asphalt contractors. Defendants purchase asphalt cement from manufacturers or distributors. Following delivery of the asphalt cement, they mix the asphalt cement at one of their asphalt plants by blending it with gravel or aggregate. The

end product is a bituminous mixture which is used by defendants to pave roadways, driveways, or parking lots.

The nature of the contracting business requires that the contractors submit bids to prospective customers for work to be done in the future. Each contractor estimates the quantity of bituminous mixture required for a job and, based on the estimate, computes its bid and submits it to the customer. If the bid is accepted, that contractor will perform the work. If for any reason the paving construction work is not completed by the end of the season in which it was bid, it "carries over" into the next construction season. "Price protection" describes an arrangement by which a supplier of asphalt cement guarantees the prices the contractor uses to compute a project bid, even if the work carries over into another contracting season.

For various reasons, each defendant failed to complete a substantial number of projects in 1973. Because of the Arab oil embargo, the cost of asphalt cement rose from $30 per ton in the spring of 1973 to $81 per ton by the time plaintiff issued its annual price letter in May 1974. Defendants' counterclaims were based on the contention that plaintiff agreed but failed to provide price protection on work carried over into the year 1974.

The jury found that the manager of plaintiff's asphalt department, Ivan Amborn, agreed to provide defendants full price protection by delivering uninvoiced loads of asphalt equal in value to the increase in price paid by defendants in 1974 and 1975 for asphalt products to be used on contracts carried over from 1972 and 1973. The jury also found that Amborn had implied and apparent authority from plaintiff to enter into such an agreement. The trial court held that enforcement of such a price protection agreement was barred by § 336.-2–201, the Uniform Commercial Code Statute of Frauds.[1]

Defendants contend the trial court erred in its holding that enforcement of the price protection agreement was barred by § 336.-2–201. There is no written document which expressly evidences the existence of such a price protection agreement, but defendants urge five separate arguments as support for their position.

First, defendants argue that there were writings which evidenced a general contractual relationship between plaintiff and defendants, that usage of trade in the asphalt industry and the course of performance between the parties demonstrated that asphalt suppliers customarily provided price protection for their customers, and that such evidence was allowable under the parol evidence section of the Uniform Com-

1. Minn.St. 336.2–201 provides: "(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

"(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

"(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

"(a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

"(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

"(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (section 336.-2–606)."

mercial Code, § 336.2–202.[2] Therefore, they argue, price protection was an enforceable term of the contract between the parties. Defendants point to the various invoices for asphalt cement sold to defendants by plaintiff and to price quotation letters dated April 27, 1973, by plaintiff to each defendant as evidence of the general contractual relationship between the parties. The price quotation letters began by quoting prices and closed with the following language, "We wish to thank you for past favors and are looking forward to supplying your requirements for the coming season." Defendants point to that language as evidence that the parties entered into a requirements contract, a term of which included price protection.

■■■ While the existence of a general underlying contract for asphalt cement sales would allow the production of extrinsic evidence demonstrating the existence of a price protection term and thus satisfy the requirements of § 336.2–201, we are not persuaded that either the 1973 and 1974 invoices or the 1973 price quotation letters satisfactorily evidence that an underlying overall contract for sale of asphalt cement was made between the parties. Each individual invoice during 1973 and 1974 stated the quantity of asphalt cement sold by plaintiff to one of the defendants and detailed the price for that quantity. Each invoice merely evidenced a separate purchase and constituted a separate contract. Nothing in the invoices suggests that they were memoranda of an underlying sales contract.

■■■ Similarly, we are not persuaded that plaintiff's 1973 price quotation letters sufficiently evidence such a general, underlying sales contract. Defendants allege that the

parties entered into a requirements contract for 1973 and, thus, that an underlying sales contract existed between the parties. They argue that the two 1973 price quotation letters were memoranda of requirements contracts between the parties for the 1973 season. The trial court disagreed with defendants and overturned the jury's finding that the 1973 price quotation letters to defendants were offers to each defendant to bind plaintiff to furnish all of each defendant's requirements for the 1973 season and that defendants by their conduct accepted that offer.

The trial court did not err in setting aside the jury's finding. As a matter of law, plaintiff's price quotation letters of April 27, 1973, to each defendant were invitations to enter into a bargain rather than a binding offer. An examination of the letters indicates plaintiff was simply quoting prices for the applicable kind of asphalt products. Professor Williston, in his authoritative treatise on contract law, states that:

" * * * [i]f goods are advertised for sale at a certain price, it is not an offer, and no contract is formed by the statement of an intending purchaser that he will take a specified quantity of the goods at that price. The construction is rather favored that such an advertisement is a mere invitation to enter into a bargain rather than an offer. *So a published price list is not an offer to sell the goods listed at the published prices. Even where the parties are dealing exclusively with one another by private letters or telegrams, or by oral conversation, the same question may arise; and language that at first sight may seem an offer may be found merely preliminary in its character.*" (Italics supplied.) 1 Williston, Contracts (3 ed.) § 27, p. 62.

---

**2.** The provisions of § 336.2–202 are: "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

"(a) by course of dealing or usage of trade (section 336.1–205) or by course of performance (section 336.2–208); and

"(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.."

See also, *Thos. J. Sheehan Co. v. Crane Company,* 418 F.2d 642, 645 (8 ·Cir. 1969); *Interstate Industries, Inc. v. Barclay Industries, Inc.,* 540 F.2d 868, 871 (7th Cir. 1976); Restatement, Contracts (2d), Tentative Draft No. 1, § 25, *comments b, c.* Furthermore, the closing language from the price quotation letters, "We wish to thank you for past favors and are looking forward to supplying your requirements for the coming season," was clearly precatory and expressed plaintiff's desire to receive orders during the coming season. It did not offer a contract to furnish each defendant's requirements for the season.

No requirements contracts for the year 1973 were entered into with defendants by plaintiff. Therefore, plaintiff's price quotation letters were not memoranda of requirements contracts. Similarly, the price quotation letters were not sufficient writings under § 336.2–202 of any other type of underlying general contract between plaintiff and each of the defendants. Therefore, the price quotation letters were not writings defendants could use as foundation to introduce extrinsic evidence of a price protection agreement.

■ Even if there were evidence of an underlying agreement, however, a price protection term such as that urged by defendants could not be enforced. Section 336.2–201(1) provides that a contract evidenced by an acceptable writing is not enforceable beyond the quantity of goods shown in such a writing. The relevant invoices did not refer to the additional uninvoiced quantities to which defendants claimed they were entitled under the price protection agreement. Therefore, to allow a price protection term in each individual contract represented by an individual invoice would involve imposing a quantity different from that detailed on the invoice. Therefore, the invoices did not constitute a writing defendants could use as a base to introduce extrinsic evidence of price protection and thereby claim that price protection was a term of a general contract between plaintiff and each of the defendants.

Second, defendants argue that they each sent to plaintiff a writing confirming their price protection agreements and, since plaintiff did not give written notice of objection to the contents of each confirmatory memorandum, the price protection contracts were enforceable under § 336.2–201(2). This argument is based on two trial exhibits (Nos. 11 and 36), which defendants claim were confirmatory memoranda of the price protection agreements. Exhibit No. 11 was titled "RECAP OF CARRYOVER WORK—from 1973." It listed projects remaining from 1973 for defendant MV to complete and detailed the total tons of paving mixture needed to finish the jobs, the asphalt content of the mixture, and the asphalt material needed for each project. The list was drawn by an employee of MV and was received by the manager of plaintiff's asphalt department, Ivan Amborn. Exhibit No. 36 was a letter received by Amborn from the manager of defendant BMI, Fran Davies, which listed jobs BMI was unable to complete in 1973, the letting date of each project, and the asphalt cement needed for each project. The list was preceded in the letter by the following sentences: "The following is a list of work in 1972 and 1973 contracts, that we were unable to complete last year. We would appreciate a price protection on these particular jobs."

■ We are not persuaded by defendants' position. A memorandum in confirmation of a contract should at least be sufficient to indicate a contract. See generally, White & Summers, Uniform Commercial Code, §§ 2–4 to 2–5, pp. 53 to 56. Exhibit No. 11 was simply a bare list of carryover jobs. Exhibit No. 36, the letter written by Davies, clearly was merely a request or, at most, a demand for price protection. Davies himself admitted that the letter was not intended to refer to an agreement for price protection. Davies, Michael McNamara (the president of both MV and BMI), and Lucian Vorphal (the president and general manager of plaintiff) had a meeting in September 1974, and both Davies and McNamara testified that they requested price protection from Vorphal

and that Vorphal denied such requests. This meeting took place after the time Exhibits Nos. 11 and 36 were transferred to plaintiff. Neither Exhibit No. 11 nor Exhibit No. 36 constituted a confirmatory memorandum under § 336.2–201(2).

Third, defendants contend plaintiff should be barred from asserting the defense of the Uniform Commercial Code Statute of Frauds provided for in § 336.2–201 by either the doctrine of promissory estoppel or the doctrine of equitable estoppel. We are not persuaded by either argument.

■ The question of promissory estoppel is not properly before this court because the argument was not presented to the trial court. Defendants submitted Requested Instruction No. 28 for the trial court's consideration as a jury instruction, but that requested jury instruction incorporated only the elements needed to find an equitable estoppel. Following the trial court's denial of that particular jury instruction, defendants moved for a new trial for, among other reasons, the "failure to submit to the jury the doctrine of estoppel as set forth in substance in Defendants' Requested Instruction Nos. 28 and 29." That request therefore went only to equitable estoppel.[3] The issue of promissory estoppel was not raised in any of the pleadings and was not included in any of the briefs submitted to the trial court. For these reasons, we will not examine defendants' argument.

■ While equitable estoppel can take an oral contract out of the statute of frauds (*Roberts v. Friedell*, 218 Minn. 88, 15 N.W.2d 496 [1944]), defendants did not adequately establish in this case all the necessary elements of equitable estoppel. Representation or concealment of material facts is an indispensable element of equitable estoppel. *Del Hayes & Sons, Inc. v. Mitchell*, 304 Minn. 275, 285, 230 N.W.2d 588, 594 (1975). Defendants claim plaintiff misrepresented its intention under the price protection contract and point to evidence that Amborn, plaintiff's asphalt department manager, orally agreed to provide price protection to defendants. Defendants contend plaintiff in fact never intended to give this price protection.

■ Defendants have not produced sufficient evidence of such a misrepresentation of intention. The only evidence defendants cite for their position is testimony by McNamara that Amborn told him just before the September 1974 meeting with Vorphal that he would deny the price protection agreement, a statement Amborn denied making. The price protection agreement defendants alleged they entered into with plaintiff would have been agreed upon months before the September 1974 meeting. Therefore, McNamara's testimony of what Amborn told him immediately before the meeting did not indicate plaintiff's intent at the time the agreement was allegedly entered into between the parties. Also, the evidence demonstrated Amborn offered and, in fact, delivered some uninvoiced loads of asphalt to defendants during 1974,[4] indicating Amborn, an agent of plaintiff, did intend to give some form of price protection. Defendants have presented no evidence that plaintiff concealed a material fact and therefore have not established in this case the applicability of the doctrine of equitable estoppel.[5]

■ Fourth, defendants argue that since plaintiff admitted it entered into con-

---

3. Requested Instruction No. 29 dealt with computation of damages, an issue unrelated to estoppel considerations.

4. At trial, plaintiff's position was that Amborn was acting without authorization in delivering the uninvoiced loads of asphalt cement and that Amborn and defendants were participating in a fraudulent scheme against plaintiff.

5. Furthermore, defendants' Requested Instruction No. 28 would have instructed the jury that the conduct of plaintiff which amounted to representation or concealment of a material fact was that plaintiff "secretly claimed that its agents had no authority to offer price protection terms." This proposed instruction was the only basis on which the trial court was able to examine defendants' equitable estoppel theory. This was different from the estoppel theory defendant asserted on this appeal. Also, there was no evidence sufficient to support the existence of this concealment of a material fact.

tracts to sell asphalt cement to defendants, plaintiff could not deny price protection was a term of these contracts, citing § 336.2–201(3)(b). Under § 336.2–201(3)(b), a contract for sale admitted to exist by a party can only be enforced for the quantity of goods admitted by that party. In the present case, plaintiff did not deny that contracts for sale were entered into in the year 1974; indeed, plaintiff's cause of action was based on the sale of asphalt cement delivered to defendants during 1974. However, plaintiff's invoices for 1974, the basis of its claim for goods sold during 1974, did not refer to any quantity of goods to be furnished to defendants in compliance with price protection agreements, and plaintiff denied it agreed to provide additional quantities as price protection. As discussed above, the price protection claimed by defendants entails the delivery of additional quantities of asphalt material and thus a modification of the quantities stated on the 1974 invoices and admitted by plaintiff. Such a modification would be contrary to the provisions of § 336.2–201(3)(b).

 Fifth, defendants now argue for the first time on appeal that plaintiff's agreement to provide price protection was a separate contract not for the sale of goods and therefore not barred by the Uniform Commercial Code Statute of Frauds, § 336.-2–201. This argument is not properly before this court because it contradicts defendants' pleadings and position at trial, and the trial court never had an opportunity to consider it. Furthermore, we are convinced that any agreement as to price protection in the present case involved a transaction in goods and was covered by the Uniform Commercial Code Statute of Frauds.

In sum, we are not convinced by any of defendants' attempts to justify taking the asserted oral agreement to provide price protection out of the Uniform Commercial Code Statute of Frauds, § 336.2–201. Therefore, the trial court correctly held that enforcement of the price protection agreement was barred.

## II. Plaintiff's Cause of Action

The primary legal issue on appeal as to plaintiff's cause of action is whether the trial court erred in enforcing plaintiff's 1-percent-per-month service charge on accounts 60 days overdue. Defendants were each advised by a letter dated May 16, 1974, that plaintiff would impose such a charge starting with invoices issued on and after June 1, 1974. McNamara, president of both MV and BMI, admitted receiving the letter. McNamara testified that he thought he called Ernest Unger, plaintiff's assistant secretary and assistant treasurer, and voiced his opinion against the service charge after McNamara received the letter on credit policy. Unger denied McNamara made any protest. Through August 1974, each defendant continued to purchase asphalt material from plaintiff. In one of its answers to the special verdict interrogatories, the jury found that after receiving plaintiff's letter of May 16, 1974, McNamara did not protest the service charge before June 1, 1974, and did not state the service charge would not be paid. Based on this answer, the trial court found defendants did not protest the 1-percent service charge until after they had ordered and received all the asphalt material at issue in plaintiff's claim.

Defendants have two arguments on this issue. First, defendants argue the trial court erred in holding that they agreed by their conduct to accept plaintiff's 1-percent-per-month service charge. They contend that because the jury found only that they did not object before June 1, 1974, and not that they never objected to imposition of the service charge, and because McNamara testified he objected to such a service charge, there was not sufficient evidence that defendants accepted the service charge.

 Defendants' argument is not persuasive. It was the responsibility of the jury to assess the respective credibility of McNamara and Unger on the issue of whether McNamara called Unger and objected to imposition of the service charge. There is sufficient evidence in the record to

support a finding either way. The jury decided in favor of plaintiff and found that McNamara did not object before June 1, 1974. The date of June 1, 1974, was significant because it was the date imposition of the service charge was to begin, and it was reasonable to infer McNamara would have objected before that date. Under these facts, the trial court's finding that defendants knew of but did not object to imposition of the service charge before they ordered the asphalt material in question from plaintiff was not clearly erroneous. Therefore, the acceptance and use by defendants of the asphalt material without protest of the May 16, 1974, terms of sale constituted consent by defendants to those terms.

Defendants argue, second, that the question of whether defendants agreed to the service charge was not submitted to the jury and that the jury's findings were not conclusive on that issue. Defendants contend that their requested special verdict question on the issue should have been submitted to the jury and that without the special verdict question there was no finding by the jury as to whether defendants agreed to imposition of the service charge. Defendants therefore argue that a new trial is required on the issue.

■■■ We must reject this argument as well. Defendants' requested jury instruction essentially asked whether either defendant consented to the service charge. The actual special verdict interrogatory submitted to the jury asked whether defendants objected to imposition of the service charge before June 1, 1974. The interrogatory was not inconsistent with defendants' proposed instruction because in this case the factual question of whether defendants objected to the service charge was the same question as whether defendants consented to imposition of the service charge. Whether the service charge was "accepted" was a legal question to be determined by the trial court. Additionally, there was no recorded objection by defendants to use of the date of June 1, 1974, in the special verdict interrogatory. Therefore, defendants waived any objections they had to using the date in the interrogatory.

A new trial on the issue of defendants' agreement to imposition of the service charge is not necessary. The jury's finding that McNamara did not object to imposition of the service charge before June 1, 1974, was conclusive, and therefore the trial court's finding that defendants knew of but did not object to imposition of the service charge before they ordered the asphalt material in question from plaintiff was not clearly erroneous. There was no error in the trial court's enforcement of plaintiff's service charge.

■■■ On this appeal, defendants have also argued that even if they agreed by their acts to imposition of the service charge, it was error for the trial court to assess that service charge for the entire period to the date of the judgment. We have examined defendants' various arguments on this issue and have concluded these arguments are likewise without merit. The trial court correctly assessed the service charge for the entire period to the date of judgment.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.