701 F.2d 1258
 35 UCC Rep.Serv. 1416
 Parvin E. DAY, d/b/a Day Associates, a sole proprietorship, Appellant,
v.
AMAX, INC., American National Bank and Trust Company of St.
Paul, a corporation, Patrick Stead and William F.
Butler d/b/a William F. Butler Co., Appellees,
George C. Shaw.
 No. 82-1024.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 14, 1982.
Decided March 9, 1983.
 
 David P. List, P.C., Arlene C. Erlebacher, Sidley & Austin, Chicago, Ill., Merlyn C. Green, Larry B. Guthrie, Maun, Green, Hayes, Simon, Johanneson & Brehl, Saint Paul, Minn., for appellant.
 Clay R. Moore, Pamela S. Gagnon, Mackall, Crounse & Moore, Minneapolis, Minn., for appellee Amax, Inc.
 Geraghty, O'Loughlin & Kenney, Professional Ass'n, James H. Geraghty, Saint Paul, Minn., for Appellees American Nat. Bank and Trust Co. of St. Paul and Patrick Stead.
 Winthrop, Weinstine & Sexton, Robert R. Weinstine, Steven C. Tourek, Wendy Willson Legge, Saint Paul, Minn., for appellee William F. Butler.
 Before LAY, Chief Judge, and BRIGHT and JOHN R. GIBSON, Circuit judges.
 BRIGHT, Circuit Judge.
 
 
 1
 Parvin E. Day, a coal production consultant doing business as Day Associates (Day), appeals from the district court's entry of judgment in favor of defendants Amax, Inc. (Amax), the American National Bank and Trust Company of St. Paul (Bank), Patrick Stead, an officer of the Bank, and William Butler. Day's complaint asserted four alternative claims and sought damages against one or more of the defendants based on Amax' refusal to sell Day two pieces of heavy mining equipment. At Day's first trial, the jury returned a verdict against Amax and awarded Day $700,000 in damages, but Judge Devitt[1] granted Amax' posttrial motion for a new trial. At Day's second trial, Judge Renner[2] granted defendants' motion for a directed verdict on all four counts and entered a judgment dismissing the action. On appeal, Day contends the trial courts erred: (1) in granting a new trial at the first trial, and (2) in directing the verdict for dismissal at the second trial. For the reasons set forth in this opinion, we affirm the judgment of the district court dismissing Day's claims against all defendants.
 
 
 2
 I. Factual Background.
 
 
 3
 During the late summer and early fall of 1977, Amax began to consider selling pieces of mine equipment. In August of 1977, Amax' vice president, Peter DeMao, informed Butler, an independent broker of heavy equipment, that Amax planned to close its Ayrcoe mine in Princeton, Indiana. Among the items Amax was considering selling were two walking draglines: a Bucyrus-Erie 1150B (1150B) and a Marion 7400 (7400). DeMao described the draglines to Butler, provided the serial numbers, and quoted a price of $1.5 to $2 million for the 1150B, and $200,000 for the 7400. Butler contacted Maurice Cornell, another broker, and told him that Amax intended to shut down its Ayrcoe mine and that it would be selling various pieces of equipment. Butler asked Cornell to be on the lookout for prospects.
 
 
 4
 In early September 1977, Day instructed one of his employees, Ron Snider, to locate a 20-to-30 cubic foot walking dragline. Snider telephoned George Shaw, a broker in heavy equipment, and informed Shaw that Day was in the market for large dragline equipment. Shaw told Snider that he did not have any draglines large enough to fit Day's needs, but that he would try to locate some. Shaw, in turn, contacted several other brokers, including Cornell, to see whether they knew of any heavy draglines for sale. Cornell told Shaw that he might know of some draglines for sale. Cornell notified Butler, who, in turn, notified DeMao that Butler had found a prospective buyer for the draglines. Butler communicated the terms that he and DeMao had agreed upon back to Cornell, who passed them on to Shaw, who passed them on to Snider. Thus, by mid-September the somewhat attenuated line of communication between the parties ran from DeMao of Amax, to Butler, to Cornell, to Shaw, to Day's employee Snider, and, finally, to Day.
 
 
 5
 On Butler's recommendation, DeMao and Butler had originally decided to require a "good faith deposit" as a condition of permitting a prospective purchaser to inspect the equipment. Butler and DeMao decided to require a deposit of $40,000 on the 1150B, and $30,000 on the 7400. Shaw communicated these terms to Snider. After discussing this matter with Day, Snider asked Shaw whether a single $50,000 deposit would be sufficient to allow Day to inspect both machines. DeMao subsequently consented to this request.
 
 
 6
 To facilitate the making of the $50,000 deposit, as well as any future sale of the draglines, Butler discussed with DeMao the possibility of using an escrow arrangement. Butler and DeMao decided to use the American National Bank as escrow agent. Butler prepared a document referred to as a "machinery agreement in escrow" (escrow agreement). This two-page document designated the Bank as escrow agent and purported to obligate the Bank to provide the 1150B and 7400 draglines at a price of $2.1 million and $325,000 respectively, and to provide an inspection.[3] Butler transmitted the escrow agreement to Day through Cornell and Shaw.
 
 
 7
 On September 20, 1977, Butler telephoned Stead at the Bank and advised him that Amax had an interest in selling some machinery, and that Butler was aware of a prospective buyer. Butler informed Stead that the Bank might be able to facilitate a possible sale by acting as an escrow agent, or by holding an inspection deposit and arranging an inspection. Butler further advised Stead that either Amax or the prospective purchaser, or both, would contact the Bank. Butler, however, never sent a copy of the escrow agreement to Stead or the Bank.
 
 
 8
 The escrow agreement described the buyer as the Brazil Coal and Clay Company.[4] On September 26, Day telephoned Stead to obtain permission to add "or Parvin E. Day" to the escrow agreement's description of the buyer. Stead said that the addition of Day's name made no difference to him because he had not seen the escrow agreement. Day also contacted Shaw to obtain approval to add his name as the buyer on the agreement. Thereafter, Day wired $50,000 to the Bank and returned the signed agreement to the Bank. Because the escrow agreement incorrectly purported to bind the Bank to provide the two draglines, Butler's attorney drafted a second agreement, under which the Bank promised to use its best efforts to obtain an inspection of the draglines for Day. Upon receiving the second agreement, Day had it retyped and forwarded a signed copy to the Bank on October 3.
 
 
 9
 Butler and Amax arranged the inspection for October 11, 1977. On that date, Day, along with Snider and another of his employees, Ron Link, met with Cornell and Shaw at a motel near the Ayrcoe mine. DeMao and another Amax representative, John Megenhart, were also scheduled to attend the inspection, but Day left for another meeting before the arrival of DeMao and Megenhart. While waiting for the Amax party, Cornell mentioned to Day and Day's employees that DeMao and Lowry Blackburn, the president of Amax, disagreed over the best method of disposing of the equipment. Shortly thereafter, Day departed and Megenhart and DeMao arrived. The entire group, without Day, then went to the mine and inspected the equipment.
 
 
 10
 At the mine, the parties discussed spare parts and the logistics of dismantling the equipment, but they did not specifically discuss the purchase and sale of the draglines. Later that day, Cornell and Shaw talked with DeMao at the airport where DeMao commented that he did not want to sell the equipment separately from the mine because that would "rape the mine."
 
 
 11
 On October 14, Day sent a letter to the Bank in which he made reference to the escrow agreement and stated, "[w]e hereby accept the above draglines and related spare parts." He further stated, "[i]t is my understanding that the $50,000 in Escrow will be applied to the purchase price of $2,425,000 * * *." Neither Day nor the Bank sent copies of this letter to Shaw, Butler, Cornell, or Amax.
 
 
 12
 Snider telephoned Shaw on October 14, 1977. According to Shaw, Snider did not mention having sent the letter of acceptance to the Bank. Shaw suggested to Snider, however, that Day ought to consider negotiating for the entire mine. Several days later, DeMao sent letters to Butler and Stead telling them that Amax had decided to sell the mine as a package and therefore the equipment would not be sold separately.
 
 
 13
 By mid-November, Butler was in the process of assembling a group of investors to purchase the entire Ayrcoe mine and equipment. Apparently, Butler indicated to Day that if this group purchased the mine it would sell Day the two draglines. Day assisted Butler in negotiating with Amax officials for the purchase of the Ayrcoe mine. In mid-January 1978, Butler informed Day that the group's plans had changed and that the group would not sell Day the draglines.[5] Day then contacted Amax directly and requested that Amax sell him the draglines. After Amax refused, Day instituted this suit.
 
 
 14
 Day's complaint asserts four alternative claims. Day alleges in the first count of his complaint that Butler and the Bank, acting either as actual or apparent agents for Amax, entered into a contract with Day for the purchase of the two draglines, and that Amax subsequently repudiated and breached the contract. In his second count, Day alleges that in the event Butler and the Bank were not authorized to act as Amax' agents, they either breached implied warranties of authority or misrepresented their authority. Day's third count is a claim against Butler, Stead, and the Bank for fraud and deceit. In Day's fourth count, he seeks recovery from the Bank for breaching its fiduciary duties of loyalty and obedience. At Day's first trial, the jury returned a $700,000 verdict in his favor against Amax on his first count, but Judge Devitt granted Amax' motion for a new trial. At Day's second trial, Judge Renner directed the verdict in favor of all defendants on all of Day's claims. This appeal followed.
 
 
 15
 II. Discussion.
 
 
 16
 A. Judge Devitt's Grant of a New Trial.
 
 
 17
 Initially, Day contends that Judge Devitt applied an incorrect standard in granting a new trial. Judge Devitt determined that although some evidence supported the jury's $700,000 award to Day on his contract claim against Amax, the jury's verdict was contrary to the clear weight of the evidence and a new trial was required to prevent a miscarriage of justice. Day argues that under this court's holding in Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc., 466 F.2d 179 (8th Cir.1972), cert. denied, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973), Judge Devitt's grant of a new trial on the basis of a "weight of the evidence" analysis constituted error. We disagree.
 
 
 18
 Day has misconstrued the holding in Fireman's Fund. In Fireman's Fund, this court did not purport to eliminate the "weight of the evidence" standard as a ground for granting a new trial. Rather, as this court explained:
 
 
 19
 Regardless of the rhetoric used the true standard for granting a new trial on the basis of the weight of the evidence is simply one which measures the result in terms of whether a miscarriage of justice has occurred. When through judicial balancing the trial court determines that the first trial has resulted in a miscarriage of justice, the court may order a new trial, otherwise not. [Fireman's Fund Insurance Co. v. Aalco Wrecking Co., supra, 466 F.2d at 187.]
 
 
 20
 In his posttrial order, Judge Devitt stated, "the court is left with a definite and firm conviction that the jury erred. The verdict is contrary to the clear weight of the evidence and a new trial is necessary to prevent a miscarriage of justice." Thus, Judge Devitt utilized a proper standard for evaluating the evidence in granting Amax' motion for a new trial. Moreover, the fact that Judge Devitt denied Amax' motion for judgment notwithstanding the verdict does not militate against his grant of a new trial. As we observed in Fireman's Fund:
 
 
 21
 "There is a difference in the function of a judge when he is ruling on a motion for a directed verdict or a judgment n.o.v. and when he passes on a motion for a new trial. * * * In the former instance, it is his duty to accept the plaintiff's version as true for the purposes of the motion, notwithstanding the existence of strong testimony to the contrary; the judge is not concerned with the weight of the evidence. On the motion for new trial, however, he has wider, though not unlimited, latitude and he may set the verdict aside where it is against the weight of the evidence, or to prevent injustice." [Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc., supra, 466 F.2d at 186, quoting Simpson v. Skelly Oil Co., 371 F.2d 563, 566-67 (8th Cir.1967).]
 
 
 22
 Accordingly, we find Day's point to be without merit.
 
 
 23
 B. Judge Devitt's Grant of a New Trial and Judge Renner's Grant of a Directed Verdict on Day's Contract Claim.
 
 
 24
 The remaining question from the first trial is whether Judge Devitt properly concluded that a new trial was necessary to prevent a miscarriage of justice. Judge Devitt found that the overwhelming weight of the evidence indicated that Butler and the Bank were neither Amax' actual nor apparent agents, and thus could not have bound Amax to a contract with Day. We need not reach this issue because, after carefully examining the records of both trials, we conclude that Day failed to present evidence that anyone, in any capacity, offered to sell him the draglines. Thus, neither jury could have found the existence of a valid contract for the sale of the draglines.[6]
 
 
 25
 Day asserts that Judge Devitt's rulings on the sufficiency of the evidence at the first trial constituted the law of the case and precluded Judge Renner from directing the verdict against Amax. We reject this contention. Although the evidence adduced at the two trials was very similar, Judge Devitt's rulings did not bind Judge Renner. See United States v. Bettenhausen, 499 F.2d 1223, 1230 (10th Cir.1974) ("The rule of the law of the case does not apply unless there is a final judgment that decided the issue."); see also United States v. Dovico, 261 F.Supp. 862 (S.D.N.Y.1966). Following the grant of a new trial, the second trial, absent any stipulations by the parties to the contrary, proceeds de novo. See generally, 66 C.J.S., New Trial Sec. 226 (1974).
 
 
 26
 Day next contends that Shaw's description of the draglines and his quotation of prices to Snider, supplemented by the escrow agreement and the discussions at the October 11 inspection, constituted an offer. We disagree. Generally, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts Sec. 24 (1981). The mere description of merchandise, coupled with the purchase terms, is not, in itself, sufficient to constitute a legally valid offer. See, e.g., Thomas J. Sheehan Co. v. Crane Co., 418 F.2d 642, 645-46 (8th Cir.1968).
 
 
 27
 Under Minnesota law[7] "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Minn.Stat.Ann. Sec. 336.2-204(1) (West 1966). Moreover, "a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Id. at Sec. 336.2-204(3). The underlying principle is that the parties must have evidenced an intent to enter into a contract. Although questions of intent are usually for the jury to decide, in this case Judge Renner properly directed the verdict because the record discloses no evidence that any of the defendants manifested an intent to enter into a contract with Day.
 
 
 28
 At best, Day's evidence suggests only that Amax made an invitation to Day to make an offer for the draglines. Throughout Butler's negotiations with DeMao both men understood that the machines might be available. Matters never progressed between the two men to the point that the sale was anything more than a possibility. Day's own evidence points this out. In his brief, Day cites Butler's testimony:
 
 
 29
 Q. Did he tell you he, DeMao, tell you in a telephone conversation prior to--on October 11 or prior thereto, that if you got there in time the equipment could go to your client?
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 A. I would say that he did, yes. [Emphasis added].
 
 Moreover, Butler testified:
 
 33
 AMAX--Mr. DeMao said to me, that it was very important that he would make that inspection. He wanted to be in on that sale if it came about when we made the date. [Emphasis added].
 
 
 34
 This testimony, quoted by Day, demonstrates only that the parties had been in the process of negotiating a contract. Butler knew that he could not offer the draglines for sale on behalf of Amax. Butler testified that he recognized that any final decision to offer the draglines for sale would have to be approved by Amax' board of directors. Butler's attorney, Alexander Hehmeyer, testified that Butler told him of the "possibility" of the draglines being for sale, and Butler, himself, described the possibility of the sale as only a "glitter of hope."
 
 
 35
 Although only Day signed the escrow agreement, the parties devoted a great deal of time to it during both trials.[8] The escrow agreement merely sets out some of the details for the inspection and some of the terms for a possible sale of one or both of the draglines. The agreement establishes a timetable for Day to pay the Bank in the event the parties do enter into a contract for the sale of the draglines. The phrase, "the balance will be paid within forty-five days after acceptance of the equipment by the buyer," cannot be stretched to imply that the document constituted an offer. In Day's October 3 letter to the Bank, Day himself stated that he was "interested in arranging to buy" one or both of the draglines. He also stated:
 
 
 36
 If I advise you I wish to negotiate a purchase of either or both machines you shall hold such funds for the next 45 days. At end of such 45 day period I shall advise you (i) to continue to hold such funds pending further advise [sic] or (ii) to return such funds or (iii) To pay our such funds on account of the purchase price.
 
 
 37
 Moreover, Day stated at the second trial that when he sent his purported acceptance letter of October 14, he was accepting Shaw's oral offer. Thus, Day conceded that he did not consider the escrow agreement to be an offer to purchase the draglines.
 
 
 38
 None of Shaw's communications with Snider can be construed to constitute an offer. All Shaw ever told Snider was that the draglines were available. Shaw and Snider discussed the details of the inspection and Snider asked Shaw if a $50,000 deposit would be sufficient to allow Day to inspect both machines. Shaw said that he would find out. Shaw also told Snider that he would send Snider the escrow agreement to finalize the terms for inspecting the draglines. Thus, in setting up the inspection, Shaw described the draglines and quoted prices to Snider, but did not offer the draglines for sale.
 
 
 39
 Viewing all of the facts and inferences in the light most beneficial to Day, we conclude that Day did not present any evidence that anyone offered to sell the draglines. Thus, no contract came into being by Day's attempted acceptance on October 14. Accordingly, Judge Renner properly directed a verdict against Amax.
 
 
 40
 C. Day's Second, Third, and Fourth Counts.
 
 
 41
 Day's second claim rests upon the theory that by offering the draglines for sale and by setting up the escrow agreement, Butler and the Bank impliedly represented that they were authorized to do so. Day claims that the defendants breached their implied warranties of authority and tortiously misrepresented their authority. Day's third claim is based upon the same facts as those in his second claim, but Day seeks recovery on a theory of fraud and deceit. Day claims that Butler, Stead, and the Bank knowingly and intentionally misrepresented their authority. In his fourth count, Day alleges that the Bank breached its fiduciary duties of loyalty and obedience. Specifically, Day contends that upon receiving his October 14 letter purporting to accept the offer for the sale of the draglines, the Bank failed to (1) communicate Day's acceptance of the draglines to Amax, (2) pay out Day's $50,000 earnest money deposit toward the $2,045,000 purchase price of the draglines, and (3) notify Day of its refusal to carry out his instructions. Day claims that as a result of the Bank's breach of its fiduciary duties, Amax refused to sell the draglines to him.
 
 
 42
 In order for Day to prevail under any of these theories, he must first prove the existence of a contract for the sale of the draglines. Because we have already determined that none of the parties ever contracted with Day for the sale of the draglines, all of Day's points must fail. Therefore, we hold that Judge Renner correctly directed the verdict in the defendants' favor on Day's second, third, and fourth counts.
 
 
 43
 III. Conclusion.
 
 
 44
 Accordingly, we affirm the trial court's judgment.
 
 
 
 [1]
 United States Senior District Judge for the District of Minnesota. At the time of the first trial, Judge Devitt was Chief Judge of the United States District Court for the District of Minnesota
 
 
 [2]
 United States District Judge for the District of Minnesota
 
 
 [3]
 See infra note 8, at 11-12
 
 
 [4]
 Day is the president of the Brazil Coal and Clay Company
 
 
 [5]
 Eventually, Butler's group successfully contracted with Amax for the purchase of the Ayrcoe mine
 
 
 [6]
 Because we hold there was insufficient evidence in either trial from which a jury could have found the existence of a valid contract, we need not address at length the propriety of Judge Devitt's grant of a new trial
 
 
 [7]
 In this case jurisdiction is based upon diversity of citizenship and Minnesota law applies
 
 
 [8]
 Because the parties emphasize the importance of this instrument we set it out in full:
 MACHINERY AGREEMENT IN ESCROW
 THIS MACHINERY AGREEMENT IN ESCROW (hereinafter referred to as the "Escrow"), to be effective between Escrow Agent and Buyer as of the ______ day of ______, 1977, by and between American National Bank of St. Paul, Minnesota (hereinafter called "Escrow Agent"), and Brazil Coal and Clay Company of Brazil, Indiana or Parvin E. Day (hereinafter called "Buyer"):
 WITNESSETH:
 WHEREAS, Buyer desires to purchase one or both of the following Walking Draglines: Marion 7400, serial number 8507 or Bucyrus-Erie 1150-B, serial number 46302; and Escrow Agent agrees to provide one Marion 7400 Walking Dragline for Three Hundred and Twenty-Five Thousand and No/100 Dollars and one Bucyrus-Eris 1150-B Walking Dragline for Two Million and One Hundred Thousand and No/100 Dollars and
 NOW, THEREFORE, for and in consideration of the sum of Fifty Thousand and No/100 Dollars in hand paid by Buyer to Escrow Agent as down payment, the receipt of which is hereby acknowledged by Escrow Agent, and in consideration of the mutual premises, it is hereby agreed between Buyer and Escrow Agents as follows:
 
 
 [1]
 Escrow Agent agrees to provide within ten days after receiving this Agreement with attached down payment an appointment to physically inspect both machines at their present location
 
 
 [2]
 Buyer hereby instructs Escrow Agent to refund the Fifty Thousand Dollar deposit in the event Buyer does not accept equipment as is and whereis [sic] within thirty days from date of inspection. This inspection to occur ten days after Escrow Agent has provided the necessary location and access to equipment
 
 
 [3]
 SCHEDULE OF PAYMENTS:
 Buyer agrees to pay Escrow Agent $50,000.00 upon signing this Agreement
 The balance will be paid within forty-five days after acceptance of the equipment by the Buyer
 
 
 [4]
 Buyer is entitled to all spare parts included with the equipment at its present location
 IN WITNESS WHEREOF, Escrow Agent and Buyer, by their duly authorized representatives, executed this Agreement on this ______ day of ______.
 American National Bank
 ("Escrow Agent")
 BY:
 Escrow Agent
 Attest
 Brazil Coal and Clay Company
 ("Buyer")
 BY: [s] Parvin E. Day
 President
 BY:
 Secretary-Treasurer