**LITTON MICROWAVE COOKING PRODUCTS, A DIVISION OF LITTON SYSTEMS, INC., Appellee/Cross–Appellant,**

v.

**LEVITON MANUFACTURING COMPANY, INC., Appellant/Cross–Appellee.**

Nos. 93–1121, 93–1126.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1993.

Decided Feb. 7, 1994.

Counsel who presented argument on behalf of the appellant/cross-appellee was Eric John Magnuson of Minneapolis, Minnesota. The names of Eric J. Magnuson and Richard J. Nygaard of Minneapolis, Minnesota, and Arthur Richenthal of New York, New York, appear on the brief of the appellant/cross-appellee.

Counsel who presented argument on behalf of the appellee/cross-appellant was Steven L. Severson of Minneapolis, Minnesota. The names of Steven L. Severson and Charles F. Webber of Minneapolis, Minnesota, and DeWitt M. Shy, Jr. of Memphis, Tennessee, appear on the brief of the appellee/cross-appellant.

Before FAGG, Circuit Judge, ROSS, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Litton Microwave Cooking Products ("Litton") brought this action for breach of warranty against Leviton Manufacturing Company, Inc. ("Leviton") for damages resulting from defective component parts manufactured and sold by Leviton to Litton for use in microwave ovens. Leviton now appeals a district court[1] judgment for damages and attorney's fees in favor of Litton. At issue is whether a price quotation letter including detailed terms of sale forms the basis of a contract for the sale of goods listed. We hold that it does not and therefore affirm.

I.

In the 1970s and 1980s, Litton manufactured microwave ovens for sale under its own label, and for other microwave vendors such as Whirlpool, who would sell the ovens under their own brand names. Leviton is a manufacturer of small electrical components such as electrical sockets, light fixtures, and switches. Beginning in the mid–1970s, Leviton supplied electrical components to Litton for a variety of products. By 1984, these included switches for microwave oven fans. In May, 1987, Litton began to receive reports of fires and smoking in some of its microwave ovens. Burned ovens examined by Litton exhibited burn patterns starting at Leviton's fan switch. Litton immediately notified Leviton, where it was discovered that a change in Leviton's manufacturing process caused the switches to arc and smoke. The defective switches were manufactured from January, 1986, to July, 1987, when the process causing the defects was isolated and corrected. These switches, however, had been installed in microwave ovens sold under Litton and Whirlpool brand names.

Litton instituted a program to replace the defective fan switches. Through their dealer and service center networks, Litton and Whirlpool sent service personnel to consumers' homes across the country to make repairs to over 75,000 ovens. The Consumer Products Safety Commission, after Litton notified it of the problem, endorsed the replacement program.

The switches that Leviton supplied were manufactured specially for Litton from stock switches altered to comport with drawings and specifications supplied by Litton engi-

---

1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

neers. Once the original design was fixed on, Leviton sent a price letter to Litton quoting the price for the switch. After receiving the price letter, Litton selected Leviton as the vendor of the switch. As prices changed from time to time, Leviton sent Litton price letters to advise it of the changes. Every price letter that Leviton sent to Litton had attached to it a copy of Leviton's "Standard Terms and Conditions of Sale."

Among its various terms, Leviton's form included an express warranty that provided that:

> Leviton warrants that products sold will, upon shipment, be free of defects of workmanship or material under normal and proper usage. Should any failure to conform to this warranty become apparent during the warranty period (in most cases one year after date of shipment), Leviton shall, upon proper written notice from the Purchaser, correct such non-conformity by repair or replacement of the defective part or parts. Corrections in the manner provided above shall constitute a fulfillment of all liabilities of Leviton with respect to the quality of the products. In no event and under no circumstances shall Leviton be liable to the Purchaser or to any other person for any indirect, special, consequential or incidental losses or damages, including, without limitation, lost profits, except to the extent that liability for personal injury, or property damage may be imposed upon Leviton by law.

Leviton's Terms and Conditions further provided:

> No modification of these Terms or Conditions will be recognized by Leviton unless specifically agreed to in writing. Failure of Leviton to object to provisions contained in any purchase order or other communication from a purchaser ... shall not be construed as a waiver of these Standard Conditions of Sale nor an acceptance of any such provisions.

Litton referred to the price letters to prepare purchase orders on its own standard forms. The warranty provision of the purchase order states, in pertinent part:

> Seller warrants that the goods described herein shall be free from defects in workmanship and materials.... These warranties shall be in addition to any other warranties expressed or implied.... All warranties shall run to Litton and subsequent purchasers of the goods or end products of which they are a part. Seller agrees, at its expense, to defend or assist in the defense of any action in any court against Litton or such purchaser, at Litton's opinion [sic], insofar as such action is based upon alleged facts which amount or may amount to a breach of the foregoing warranties. Seller agrees to indemnify Litton and such purchasers from all liability, loss, costs, and expense, including reasonable attorney's fees, resulting from any breach of any or all said warranties, expressed or implied.

Litton's purchase order also contained an "acceptance" clause, which provides:

> This Purchase Order becomes a binding contract upon the terms and conditions set forth herein when it is accepted either by an acknowledgement or any performance. No revision to this Purchase Order shall be valid or binding unless any such revision is in writing and is signed by an authorized representative of Litton and no condition stated by Seller in accepting, acknowledging, or amending this Purchase Order shall be binding upon Litton if in conflict with, inconsistent with, or in addition to terms and conditions contained herein unless expressly accepted in writing by an authorized representative of Litton.

At trial both parties claimed that their respective forms represented the terms of the contract. Leviton also asserted that industry custom and practice, course of dealing, and usage of trade dictated recognition of its version of the warranty. Litton attempted to anticipate this defense by calling an adverse witness in its case in chief, and then calling a rebuttal witness to refute the testimony of its own witness. The trial court submitted the issue of which form controlled to the jury, which returned a verdict for Litton. Based on this verdict, and the stipulation of the parties as to certain elements of Litton's claimed losses, the district court en-

tered judgment in favor of Litton for $4,009,-574, including $710,254 in attorney's fees for this litigation. The court denied additional claims by Litton for attorney's fees and replacement expenses in the amount of $543,-000.

Leviton assigns error to three determinations by the district court. First, Leviton asserts that the issue of which form governed the terms of the contract was properly one of law and not of fact. Second, Leviton believes that the district court improperly denied its motion for a new trial given Litton's rebuttal of its own witness and the court's submission of materially conclusory jury instructions. Finally, Leviton maintains that even if Litton's form is found to control the transaction, it does not call for an award of attorney's fees in this case, as the district court found. Litton excepts to the denial of additional fees and expenses. We address each of these claims in turn.

## II.

Leviton asserts that the contract that serves as the subject of this dispute was formed through an exchange of forms between the parties; Leviton's price letters and catalogs constituted, its argument runs, the "first shot" in what has come to be known in the language of contract law as "the battle of the forms." *See generally* Douglas G. Baird & Robert Weisberg, *Rules, Standards, and the Battle of the Forms: A Reassessment of § 2–207,* 68 Va.L.Rev. 1217, 1218–19 (1982).

It was once the law, under the "mirror image" rule, that an offer had to be accepted exactly "as is" or the response amounted only to a counter-offer. There was no contract unless the original offeror accepted the counter-offer. Section 2–207 changed all this in the case of merchants. This section, adopted in Minnesota as Minn.Stat. § 336.2–207, allows merchants to contract for the sale of goods without having to negotiate and draft formal contracts. With the adoption of § 2–207, a merchant can accept an offer made on the offeror's form by using his own standardized form so long as the response does not "materially alter" the terms of the offer. Section 2–207, therefore, resolves a

"battle of the forms" in favor of the first form transmitted.

For a "battle of the forms" to arise and trigger the provisions of § 2–207, there must be conflicting forms to begin with, each of which satisfies the common-law or statutory requirements for an offer. If the first form is not an offer, there can be no battle. Leviton's defense to liability under the contract, therefore, depends upon whether its form—its catalog and price quotation letters—satisfies the requirements of an offer. Under Minnesota law of the sale of goods, where a manifestation by a party is "clear, definite and explicit, and leaves nothing open for negotiation, it constitutes an offer...." *Short v. Sun Newspapers, Inc.,* 300 N.W.2d 781, 786 (Minn.1980) (quoting *Lefkowitz v. Great Minneapolis Surplus Store, Inc.,* 251 Minn. 188, 86 N.W.2d 689, 691 (Minn.1957)).

Under this rule, price quotes and catalogs generally are not offers to form a contract. *W.H. Barber Company, Inc. v. McNamara–Vivant Contracting Company, Inc.,* 293 N.W.2d 351, 355 (Minn.1979); *See also, Day v. Amax, Inc.,* 701 F.2d 1258, 1263 (8th Cir. 1983). In *W.H. Barber Company,* an asphalt cement distributor brought an action for payment on materials delivered to two paving contractors. The contractors counterclaimed, asserting that the distributor's price quotation letter amounted to an offer to enter into a requirements contract with the paving companies to supply their needs for work undertaken at a price that was not subject to increases. The Supreme Court of Minnesota found that the distributor's price quotation letters merely invited the contractors to make offers, and could not be used as a basis to prove a price protection term in the underlying contract. *Id.*

A similar result was reached in *Day v. Amax, Inc.,* 701 F.2d at 1258. There, a coal production consultant brought an action against a mining company for breach of a contract to sell mining equipment. The mining company had set up an escrow account for a possible sale, and had given the plaintiff signed writings that contained a detailed description of the equipment and the terms of sale. We ruled that the mining company's refusal to sell the equipment did not rise to

the level of a breach of contract. *Id.* We reasoned that "[t]he mere description of merchandise, coupled with the purchase terms, is not, in itself, sufficient to constitute a legally valid offer." *Id.* at 1263. Without a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it," there was no contract to breach. *Id.*

It is quite conceivable that under certain circumstances a price quote or catalog may constitute an offer. *See, e.g., A. Belanger & Sons, Inc. v. U.S. for Use and Benefit of National U.S. Radiator Corp.*, 275 F.2d 372 (1st Cir.1960). We believe, however, that the circumstances of the present case do not remove Leviton's price quotation letters and catalogs from the general rule that such documents are not sufficient to constitute a legally valid offer. There is, of course, little question that both the price letters and catalogs were clear, definite, and explicit, but it is difficult to maintain that they left "nothing open for negotiation." When and where might the parts listed be delivered? Was Litton obligated to purchase all the parts listed in the quantities listed, or might they be able to purchase just what was necessary to fill their needs by picking and choosing from the parts listed? Could Litton feel justified, based on the quotation letters alone, in finding Leviton in breach of contract if Leviton were to be unable to fill any purchase order submitted?

It is true that "[t]he Uniform Commercial Code does not require that all of the terms of the agreement be decided provided 'the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.'" *N & D Fashions, Inc. v. DHJ Industries, Inc.*, 548 F.2d 722, 725 (8th Cir.1976) (quoting U.C.C. § 2–204(3)). Without definite and affirmative answers to the foregoing questions, however, and perhaps to some others, Leviton's price letters and catalogs amount to no more than "the mere description of merchandise, coupled with the purchase terms . . . ." *Day v. Amax, Inc.*, 701 F.2d 1258, 1263 (8th Cir. 1983). As such they are not, under Minnesota law, "sufficient to constitute a legally valid offer." *Id.* Since Leviton's price letters and catalogs are not offers to form a contract, the "battle of the forms" doctrine embodied in U.C.C. § 2–207 and Minn.Stat. § 336.2–207 has no bearing on this dispute.

This conclusion also means that Litton's purchase order constituted the first manifestation of assent to be mutually bound. As such, the terms of Litton's purchase order govern the relationship in question. The district court, therefore, did not err in denying Leviton's motion for summary judgment and judgment as a matter of law. Furthermore, submission of the question to the jury of which form controlled constitutes harmless error, since the jury resolved the issue the same way the court should have resolved it. Since the meaning of Litton's form was not ambiguous, and the form itself constituted the contract as a matter of law, there was no issue for the jury to decide. Leviton's complaint about the admission at trial of rebuttal testimony, therefore, falls from the case and thus we will not address it.

### III.

Leviton next raises the issue of whether Litton is entitled to an award of attorney's fees under the terms of the Litton purchase order. Factual determinations concerning an award of attorney's fees are reviewed under a clearly erroneous standard, while the district court's determination of the amount of the fee award is reviewed for abuse of discretion. Interpretation of an unambiguous fee-shifting clause, however, is one of law to be reviewed de novo by this court. We deal first with the interpretation of the clause.

### A.

The relevant clause of the purchase order provides, in pertinent part:

> Seller agrees to indemnify Litton and such purchasers [purchasers of Litton's products] from all liability, loss, costs and expense, including reasonable attorney's fees, resulting from any breach of any or all said warranties, express or implied.

Leviton asserts that the clause limits Litton's recovery of attorney fees to those circum-

stances where attorney fees are incurred while defending claims brought against the party seeking indemnity by a third party. In support of its construction, Leviton cites cases that stand for the proposition that an award should not be made for fees and expenses incurred in establishing the right to indemnity.

■ Construction of the clause in question requires reference to Minnesota law. That law demands that contract terms be given their plain and ordinary meaning. *Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310–11 (Minn.1989). An ambiguity exists only if the contract's language is reasonably susceptible to more than one meaning. *Trondson v. Janikula*, 458 N.W.2d 679, 681 (Minn.1990). We view the clause in question, therefore, through the narrow window of these two rules of construction.

The word in the indemnity clause of Litton's purchase order that serves as the focus of contention in this case is "indemnify." Webster's Third New International Dictionary defines indemnify as:

1. a: to secure or protect against hurt or loss or damage;
   b: to exempt from incurred penalties or liabilities.
2. to make compensation to for incurred hurt or loss or damage.

Merriam–Webster's Third New International Dictionary, 1147 (Unabridged) (1986). From this plain definition of the word it is difficult to extract the meaning that Leviton would have us apply.

Leviton cites *American Dist. Tel. Co. v. Kittleson,* 179 F.2d 946, 951 (8th Cir.1950) to support its interpretation. Reliance on that case is misplaced. In that case, we were attempting to explain the difference between the concepts of common-law claims for indemnification and contribution. In no way was the court attempting to define the word "indemnify."

While we find no Minnesota cases dealing directly with this point, this court has before rejected the very reading that Leviton urges. In *Fortune Southfield Co. v. Kroger Co.,* 931 F.2d 1282 (1991), we were asked to interpret contract language similar to that presently

before us. The *Fortune Southfield* remedy provision stated:

Kroger agrees to indemnify and hold Schnucks harmless against any loss, cost, liability or expense, including cost and expenses of litigation and reasonable attorneys fees, arising ... by reason of the incorrectness or breach by Kroger of any of its representations, warranties and agreements set forth in this agreement.

931 F.2d at 1284. We held that this language required Kroger to reimburse Schnucks for the attorney's fees and expenses that it incurred in a direct action against Kroger. *Id.* We found the language of the remedy provision "clear and unambiguous." *Id.*

The language of the indemnity provision now before us is virtually indistinguishable from that at issue in *Fortune Southfield.* Only a strained reading could produce the third-party suit requirement that Leviton would have us impose on the indemnity clause. Such a construction would produce the odd result of paying Litton's attorney's fees if, but only if, Litton waited to be sued by consumers for the damage resulting from the breach of warranty. The plain language of the provision does not appear to demand such a circumstance.

### B.

■ We are required to be more deferential with respect to district court determinations of the amount of fee awards, and the underlying findings of fact. Litton requested $999,690.82. The district court reduced that amount by $289,436.50, and awarded Litton $710,254.32 in pretrial and trial attorney's fees and expenses. Litton cross-appeals the reduction of the award. The amount of an award of attorney's fees rests within the sound discretion of the court and we will not disturb it absent a clear abuse of that discretion.

The district court identified two reasons for reducing Litton's fee award. The first was the number of repetitive motions for reconsideration and clarification that Litton filed. It was the judgment of the trial court that Litton's repeated filing of motions for

reconsideration and clarification imposed an undue burden on the court and on Leviton, and impeded the progress of the litigation. The court felt that Litton failed to show regard for the effects of its filings. Second, the court found that Litton spent an unreasonable and unjustifiable amount of time and money trying to prove the cause of the defect of the fan switch. The court noted that Litton had requested information regarding the cause of the defect from the Consumer Products Safety Commission (CPSC) as early as November, 1987. Leviton drafted the submission for the CPSC, which included a detailed analysis of the source of the problem. The district court found that despite this Litton spent thousands of hours and hundreds of thousands of dollars in expert witness fees proving the source of the defect. The court also noted that Litton deposed 21 witnesses in New York and South Carolina with respect to this issue.

Litton asserts that these expenditures were necessary to clarify orders of the district court and to prepare thoroughly for trial. While there may be room for dispute as to how the facts are characterized, there is no basis by which this court can find that the district court's findings are clearly erroneous, or that it abused its discretion when making the fee award.

■ Litton also claims that its motion for post-trial fees was improperly denied because the district court failed to make specific findings of fact with respect to these. The district court does make reference to "all of the information before the court" as the basis for the denial of post-trial attorney's fees, but fails to make specific findings of fact. Without such specific findings, we are unable to review the district court's decision. Accordingly, we remand this issue to the district court for more detailed findings of fact with respect to the unreasonableness of Litton's post-trial attorneys's fees.

## IV.

■ In its cross-appeal, Litton assigns error to the district court's denial of its request for an additional $254,000 in costs for replacing fan switches in Whirlpool brand ovens. The district court found these costs to be unreasonable. "Damage awards are usually reviewed under the clearly erroneous concept embodied in Fed.R.Civ.P. 52(a)." *Downtowner/Passport International Hotel Corporation v. Norlew, Inc.,* 841 F.2d 214, 218 (8th Cir.1988).

*Litton's own auditors found the very expenses sought unreasonable.* They identified two types of expenses as being unreasonable: the use of multiple fixed rates for single-site repairs, and the use of in-house as opposed to outside labor to repair the Whirlpool ovens. The district court noted that Litton's own auditors determined that these two expenses were unreasonable. The court agreed. The first involved invoices for full service costs, including travel time for each oven, where multiple ovens were serviced at a single location. The court found that $162,000 in these damages could have been avoided.

The second unreasonable expense was the charge for the use of in-house Whirlpool employees instead of outside Whirlpool service agents. The court found Whirlpool's in-house labor rate to be substantially higher than labor contracted for on the open market with authorized Whirlpool agents. The court determined the overcharge for the use of in-house labor amounted to approximately $92,000. The district court refused to award this amount to Litton, finding instead that the stipulated damage amount already included reasonable labor charges.

It is Litton's position that the U.C.C., as modified by the express terms of the contract, does not limit its recovery to those costs deemed as reasonable, but includes unreasonable expenses as well. Section 2–719(1)(a) permits parties to a contract for the sale of goods to modify the rule expressed by U.C.C. § 2–714 that requires damages for breach of warranty be reasonable.

We need not address the issue of whether Litton is correct when it notes that the contract could have, by express language, modified the reasonableness requirement for damages under § 2–714. The language of Litton's purchase order makes no such express modification. In the absence of such express language, the contract should be construed literally against the drafter. *Empire State*

*Bank v. Devereax,* 402 N.W.2d 584, 587 (Minn.Ct.App.1987). Without an express expansion of the remedy term to include unreasonable costs, the contract must be read within the environment in which it was written and agreed to, that is, against the backdrop of the default rules supplied by the Uniform Commercial Code, including Minn. Stat. § 336.2–714.

## V.

For the foregoing reasons, we affirm the judgment of the district court in part, and remand for further findings on the issue of post trial attorney's fees.